[Crim. No. 21775. Mar. 11, 1982.]

THE PEOPLE, Plaintiff and Respondent, v.
DONALD LEE SHIRLEY, Defendant and Appellant.

20

COUNSEL

Stephen C. Hosford, under appointment by the Supreme Court, for Defendant and Appellant.

Ephraim Margolin and William S. Mount as Amici Curiae on behalf of Defendant and Appellant.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Harley D. Mayfield and John W. Carney, Deputy Attorneys General, for Plaintiff and Respondent.

John K. Van de Kamp, District Attorney (Los Angeles), Harry B. Sondheim, Dino John Fulgoni and Roderick W. Leonard, Deputy District Attorneys, as Amici Curiae on behalf of Plaintiff and Respondent.

OPINION

MOSK, J.—The principal question on this appeal is whether a witness may be allowed to testify after he has undergone hypnosis for the purpose of restoring his memory of the events in issue. The question is new to this court, but has been often litigated in our sister states and exten-

sively studied by medical science. In accord with recent and persuasive case law and the overwhelming consensus of expert opinion, we conclude that the testimony of such a witness should not be admitted in the courts of California.

## I

The record discloses a classic case of conflicting stories. There were only two witnesses to the principal events: the complaining witness, Catherine C., told the jury that defendant compelled her by threat and force to submit to sexual intercourse and to orally copulate him; defendant testified, however, that Catherine willingly participated in the act of intercourse, and there was no oral copulation. The jury believed part of Catherine's story, as it convicted defendant of rape; but it also apparently found that she was lying when she described in detail the alleged act of oral copulation, as it acquitted defendant of that charge.[1] The jury doubtless had a difficult task, since Catherine's performance as a witness was far from exemplary: the record is replete with instances in which her testimony was vague, changeable, self-contradictory, or prone to unexplained lapses of memory. Indeed, on occasion she professed to be unable to remember assertions that she had herself made on the witness stand only the previous day.

In such circumstances it is particularly important that the testimony of the complaining witness be free of taint, lest a mistaken conviction result. Yet as we shall see, in the case at bar the prosecution contaminated Catherine's testimony by subjecting her to a hypnotic experience on the eve of trial for the purpose of "filling the gaps" in her story. To allow her to testify against defendant after that experience was error; and in the light of the entire record, we are of the view that the error caused a miscarriage of justice requiring reversal of the judgment. (Cal. Const., art. VI, § 13.)

## A

Catherine was a 32-year-old bartender at a saloon named Bud's Cove, not far from the Camp Pendleton Marine base. The first prosecu-

---

[1]In addition, defendant was convicted of the derivative charge of unlawfully entering Catherine's apartment with intent to commit a felony, presumably the rape. (Pen. Code, § 459.) The court stayed execution of the sentence on this count until completion of the sentence on the other, the stay to become permanent at that time.

tion witness, Marine Sergeant Charles Lockskin, testified that at 8:50 p.m. on January 25, 1979, he entered Bud's Cove and approached Catherine, whom he had known for several months. She was off duty, and "looked like she was feeling kind of bad." She had a half-consumed martini in front of her, was under the influence of alcohol, and staggered when she walked.

After talking with her for some 15 minutes, Lockskin offered to get her something to eat and take her home. They drove in his car to a take-out restaurant, purchased some food, and arrived at Catherine's apartment house at 9:30 p.m. She vomited when she got out of the car; as this was happening, defendant came up to Lockskin and addressed him by name; Lockskin asked him to leave, and defendant did so. Lockskin then helped Catherine into the apartment and went into the kitchen to prepare some drinks. When he returned to the living room, however, she had passed out on the couch and was fast asleep. After failing to rouse her by shaking her, he covered her with a blanket, turned out the lights, locked the front door, and departed. It was shortly before 10 p.m.

The next witness was Catherine. She testified that on the evening in question she went off duty at Bud's Cove at 6:30 p.m., ordered two martinis, and sat "relaxing" until Lockskin came in. Her testimony as to her activities with Lockskin generally corroborated his, and she admitted she could "feel" the alcohol she had consumed.

Catherine's version of the events occurring after she fell asleep was as follows: she testified that she awoke some time later, still lying on the couch fully clothed, and found defendant standing naked by the coffee table holding a butcher knife.[2] Defendant assertedly took her into the bedroom, ordered her to remove her clothes, and compelled her to orally copulate him for several minutes. The witness admitted that she felt "like I was in a dream" and events were moving in "slow motion."[3]

---

[2]Catherine later told the police that defendant was holding both a butcher knife and an "ice pick." She subsequently changed her story and described the latter as a large Phillips screwdriver. At trial the prosecution produced neither knife, ice pick, screwdriver, nor any other weapon.

[3]As noted above, the jury impliedly found that her testimony describing the alleged act of oral copulation was false.

Catherine then stated that defendant made her get on her knees, tied her hands behind her back and gagged her with nylon stockings, put her head down on the bed, and had intercourse with her in that position for up to half an hour. When she tried to turn her head to see who he was, he struck her with his hand and ordered her not to look at him; later he put a pillow over her head for the same purpose, and struck her on the hip. She claimed the latter blow sobered her so that she no longer felt the effects of her prior drinking.

Until this point the apartment had remained totally dark, and she could see the intruder only as "a shadow." According to Catherine, however, defendant abruptly desisted from further intercourse, removed her bonds and gag, took her back into the living room, and turned on the lights.[4] For the next half hour the two sat naked on the couch, she on his lap, and chatted. Finally he asked her if she liked beer, and she replied that she did; he volunteered to get some from his apartment, and told her where he lived.[5] He dressed and left on this errand; on his return with the beer he took his clothes off again, she got back on his lap, and the conversation resumed.

After another quarter of an hour, defendant suggested they take a shower together, and she agreed. As they entered the bathroom, however, the telephone rang. The caller was assertedly a "girlfriend" of Catherine named Mickie, who announced she was coming over to the apartment. Catherine relayed this fact to defendant, and told him that he could return at another time and she would cook dinner for him. According to Catherine, defendant then got dressed, wrapped the knife and screwdriver in an extra T-shirt he had brought, thrust them down the front of his pants, and left when Mickie arrived. Catherine testified she told Mickie she had been raped by a Marine, and Mickie gave her a strong sedative—a 100-milligram dose of a drug called Mellaril.[6] Mickie stayed for half an hour, and immediately after she left Cather-

---

[4]She claimed that as they entered the living room defendant told her he had intended to take her money but "he seen my bible on the nightstand next to the bed and changed his mind." The witness did not explain how defendant could have recognized a bible in the dark.

[5]Defendant lived close by, in an apartment separated from Catherine's complex by a single building.

[6]Catherine admitted that Mellaril had been prescribed for her to take four times a day, and that she had taken such a dosage for about six months. She denied, however, that she had used the drug within the previous 18 months.

ine called the police. According to Catherine, it was 10 minutes before 1 a.m.

On cross-examination Catherine admitted that during their long conversation in the living room defendant told her numerous personal details about himself, e.g., that he lived in the next apartment building, that his name was Don, that he was 22 years old, that he was married and had a child, that he was a Marine but was not happy in the service, and that the next morning he had to go to Bridgeport, California, for cold-weather training.[7] She claimed that she engaged defendant in the foregoing conversation only because she was afraid he would do her further harm; yet she conceded that when defendant went to get the beer he left the knife and the screwdriver on her living room floor but that she did nothing about them, and that while he was gone she remained sitting naked on the couch. Although she had a telephone she did not call the police or anyone else for help, nor did she dress and go to the nearby apartment of the building manager who was admittedly "a big guy," nor did she even lock the front door. She also acknowledged that she did not know Mickie's last name, address, or telephone number, or where she was at the time of trial, and indeed had never seen her since the night in question.[8]

On redirect examination Catherine testified that until defendant turned on the lights in the apartment, she thought the person having intercourse with her was an older man who resembled defendant and had flirted with her at the bar where she worked.[9]

Police Officer Russell Lane testified that the telephone call reporting the rape came at 1:45 a.m., an hour later than Catherine claimed. He went immediately to her apartment and found her under the influence of alcohol: her breath had the smell of someone who "had been drinking quite heavily," her speech was slow and at times difficult to understand, and her walk was unsteady. She told the officer she had been brought home "very drunk" from Bud's Cove at midnight, that she fell asleep on the couch, and that she awoke in her bed at 12:30 a.m. She gave the officer a physical description of defendant, and repeated the personal

---

[7]As appeared from the testimony of the police officer who responded to her call and took a description, defendant also told Catherine exactly which company he was in at Camp Pendleton.

[8]Not surprisingly, the prosecution did not produce Mickie as a witness.

[9]Defendant testified that Catherine told him "she thought I was some major."

information defendant had disclosed to her during their conversation. She then complained that her buttocks hurt, and the officer took her to a local hospital.

At the hospital she was examined by a physician. He testified that he found a bruise on her right hip and "crease marks" on her wrists. But although the latter were consistent with her hands having been tied by a fabric, he could not tell their cause and described them as the kind of marks one receives from sleeping on wrinkles in the bed linen. She reported to the physician that she used "occasional Mellaril and alcohol frequently." He testified that Mellaril is "a major tranquilizer," and that in doses of 100 milligrams or more per day it is prescribed primarily for psychotic states, schizophrenia, and manic-depressive cases.[10]

After the physical examination, Police Officer Leonard Goodwin took a statement of the evening's events from Catherine. The next morning Officer Lane went to defendant's apartment and arrested him as he was leaving to report for duty. When the officer announced the charges were burglary and rape, defendant became angry and said he had "picked up a drunk bitch at Bud's Cove and took her home and fucked her," and "now she wants to report that he raped her" and "that is all a bunch of bullshit."

Defendant took the stand in his own defense. He testified that a few days before these events Catherine had waited on him at Bud's Cove. On the evening in question he entered the bar and saw her sitting with Sergeant Lockskin, whom he recognized. When Lockskin went to the men's room, defendant approached her and asked how she was feeling. They had a brief conversation; according to defendant, she told him her name was Cathy, identified the apartment house in which she lived, and invited him to "grab a six-pack sometime and come over." When Lockskin returned, defendant left the bar and bought some beer at a liquor store. After failing to locate a friend of his, defendant walked to Catherine's apartment house. As he approached, Catherine and Lockskin drove up and defendant spoke briefly with the latter.[11] Defendant then returned to his own apartment for a while, drank some beer, and went back to Catherine's building. When asked why he did so, he explained,

---

[10]The doctor's testimony concerning the uses of Mellaril was corroborated by another physician-witness, Dr. Donald Schafer. The remainder of Dr. Schafer's testimony is discussed below. (See pt. I B, *post.*)

[11]As noted above, Sergeant Lockskin corroborated defendant's testimony in this regard.

"Well, my wife was back home in Indiana. I was by myself. Kind of lonely. And I had an invitation to come to her apartment."

On his arrival, defendant knocked twice on Catherine's door; there was no response, but he thought he heard someone inside who was moaning as if ill. When no one answered further knocking, he called her name through the window and lifted off the screen. He testified that he believed someone inside was sick.[12]

At that point Catherine opened the front door and defendant asked, "Are you okay?" He handed her the screen; she put it next to the front door, went back to the living room, and lay down on the couch. Defendant sat next to her and repeated his question, "Are you okay?" Her reply was to put her arms around his neck and begin kissing him. He responded, and at his suggestion they soon moved to the bedroom. There she cooperated in helping him remove her clothes; defendant returned briefly to the living room for his cigarettes, stripped down, and rejoined her on the bed. They proceeded to have intercourse in the "missionary position," then turned so that he entered her vaginally from behind. She abruptly asked defendant to stop and he did so. He inquired what was wrong, and she replied that she "couldn't be emotionally turned on by men."

Defendant's testimony as to the ensuing events was substantially the same as Catherine's. They sat unclothed on the living room couch talking for half an hour, and he told her all about himself. In turn, she told him that she too was from Indiana, that times were hard for her and she was having problems, and that she had seven children in Knightstown Home for Children. She became upset and began to cry, saying that nobody loved her. As Catherine had testified, defendant went home to get some beer and then suggested they take a shower, but the evening ended when Mickie called on the telephone. He dressed and waited for the latter to arrive, feeling that Catherine "was just in a wrong state of mind to be left alone." After some minutes Mickie entered carrying a six-pack of beer under her arm, and defendant left.

---

[12]The defendant was not the first person who had removed that screen for the purpose of climbing through Catherine's bedroom window. In the prosecution's case-in-chief Sergeant Lockskin testified that he was the previous tenant of the same apartment; that Catherine had moved in with him for a month; and that about three weeks before the night in question he returned home with her and discovered he had lost his key. Lockskin testified he thereupon removed the screen on the bedroom window and climbed through it into the apartment.

Defendant acknowledged the angry denial he made when Officer Lane accused him of rape the next morning; and he further denied that he broke into Catherine's apartment, or threatened her with a knife or screwdriver, or tied her up or struck her, or had intercourse with her without her consent, or engaged in any act of oral copulation.

Finally, a number of Marine officers, including defendant's platoon commander, his company first sergeant, and his company commander, testified in his behalf. On the basis of their experience they unanimously expressed high personal regard for defendant's truthfulness and honesty, and reported that he had a good reputation for those traits of character. His first sergeant further testified that he was made aware of any altercations occurring in the company, and that defendant had no history of engaging in aggressive or violent behavior.

## B

We relate next the evidence bearing on the issue of hypnosis. Prior to trial, counsel for defendant moved to exclude all testimony of the complaining witness that was the result of her having been hypnotized. He offered to prove that the case was originally set for trial on May 1, 1979, but was trailed because of the unavailability of an adequate jury pool; that in the evening of April 30, 1979, i.e., more than three months after the events in question, the deputy district attorney assigned to the case, Richard Fulton, had Catherine hypnotized by another deputy district attorney, Richard Farnell, at the courthouse and in the presence of Mr. Fulton and one Terry Moore; and that Catherine made certain statements under hypnosis which would cause her testimony at trial to be significantly different from her testimony at the preliminary hearing. Counsel then identified one such discrepancy, and argued that "this is an improper use of hypnosis" because "it is not in fact refreshing a witness's recollection" but "it is in fact manufactured evidence." He distinguished those cases in which hypnosis has been used for such purposes as helping an eyewitness to remember a license plate number. He denied that any court in this state had ruled the use of hypnosis permissible in all cases, and charged that here the People were attempting "to expand hypnosis into an area [in] which they cannot lay adequate foundation for its reliability" as a tool for refreshing recollection.

The trial court denied the motion, ruling that prior hypnosis of a witness affects the weight but not the admissibility of the testimony. Accordingly, the court directed that if Catherine gave evidence that she

could not remember—or that did not exist—before she was hypnotized, the fact and circumstances of that hypnosis should be put before the jury.

Pursuant to this ruling, Catherine was allowed to testify to a number of matters that she assertedly had been unable to recall on two occasions prior to hypnosis, i.e., when she gave statements to the police on the night of the events in question, and when she testified at the preliminary hearing. For example, on those occasions she stated that after falling asleep in her clothes on the couch in her living room, she awoke in her bedroom and found herself lying naked on the bed, gagged and bound. At trial, as noted above, she testified instead that when she awoke she was still on the couch and fully clothed, and defendant then forced her to go into the bedroom and get undressed. Again, prior to hypnosis she stated that defendant had sexual intercourse with her before as well as after the alleged act of oral copulation, while at trial she testified that the oral copulation preceded any intercourse whatever. Prior to hypnosis she stated that her hands were tied during the oral copulation, while at trial she denied this claim. Finally, prior to hypnosis she stated that the first time she saw the knife in defendant's hand was when they returned to the living room after the sexual intercourse, while at trial she testified she saw it when she awoke on the couch before entering the bedroom.

Both counsel explored the nature and effect of Catherine's hypnotic experience. According to Catherine, before being hypnotized she recalled the events of the evening in question only "vaguely." She discussed the gap in her recollection with Deputy District Attorney Fulton, and consented to be hypnotized "for the purpose of going back over what occurred that night." She verified that she was hypnotized on April 30, 1979, in the courthouse, by Mr. Farnell; although the latter had "some training," he was not a psychiatrist or even a physician. She had not been hypnotized before, but she "just knew" that it enables a person to "remember more than normal."

Apparently she was not disappointed in that expectation. She agreed that the hypnosis at least partly "cured" her recollection as to "this sort of dreamlike period that we're talking about." She credited the hypnosis with causing her to "fill in the gap" in her memory, and also to recall that certain events took place in a different sequence. In particular, she specifically ascribed to the effect of hypnosis each of the above-listed changes between her testimony at trial and her pretrial statements to the police and testimony at the preliminary hearing.

The defense called Dr. Donald W. Schafer as an expert witness to testify on the subject of hypnosis. Dr. Schafer is a board-certified psychiatrist with 16 years of private practice and 10 years on the staff of the University of California at Irvine, where he is a clinical professor of psychiatry. He has had extensive training in hypnosis, and has used it in his practice for two decades.[13] Dr. Schafer acknowledged that hypnosis has certain valid medical uses, such as pain control and relief from various psychosomatic symptoms. In appropriate cases it can also be used for the treatment of neuroses, e.g., by assisting a patient to recover repressed memories of traumatic events, including rape.

Dr. Schafer warned, however, that there are grave risks in relying for other purposes on the accuracy of memories recalled under hypnosis. He explained that while no one knows exactly how the human mind stores information, it does *not* act like a videotape recorder, i.e., a machine capable of "playing back" the exact images or impressions it has received. Rather, "there are many things that alter the storage of exact memory." There is therefore no assurance, the doctor testified, that a memory recalled in hypnosis is correct. On the contrary, a person under hypnosis can be mistaken in his recollection, or can hallucinate, or can "confabulate," i.e., create a false or pseudomemory, or can even deliberately lie. Indeed, it may be easier to lie under hypnosis, because from the viewpoint of the person in the trance "the hypnosis would put the responsibility on the shoulders of the hypnotist."

Dr. Schafer made four additional important points. First, when a person is put under hypnosis and asked to recount an event, no one is able to determine whether he is telling the truth.[14] Second, when a person has a subconscious motive to distort the truth, e.g., in order to make himself look better in the eyes of others, that motive will usually operate even under hypnosis; indeed, "hypnosis would in a sense give [him] permission" to engage in such distortion. Third, the effect of hypnosis on a preexisting memory is usually additive, i.e., it may permit the recall of additional details; if instead the person remembers the event

---

[13]In addition, Dr. Schafer is a past national president of the Society for Clinical and Experimental Hypnosis, a fellow of the American Society of Clinical Hypnosis, and the founding president of both the California Society of Clinical Hypnosis and the Orange County Society of Clinical Hypnosis. As well as using hypnosis in his psychiatric practice, he has taught advanced courses in medical hypnosis and hypnoanalysis. Finally, as of the date of trial he had written 10 to 15 professional articles on hypnosis.

[14]Dr. Schafer stated that this was not only his opinion but the consensus of his profession, and he attributed that consensus to the work of Dr. Martin T. Orne of Philadelphia. We cite Dr. Orne's work in some detail below. (See pt. III D, *post.*)

differently under hypnosis, the discrepancy implies either that his statement describing the preexisting memory was a lie or that the memory under hypnosis was a confabulation. Fourth, when a person has been asked to recall an event while under hypnosis, and after hypnosis is asked to remember the same event, the effect of the prior hypnosis is to remove all doubt he may have had about the event; such persons would be "convinced that what they had said in hypnosis was the truth."

On cross-examination Dr. Schafer testified that although the hypnotic induction in the case at bar was excellent from the viewpoint of technique, the hypnotist did not take into consideration Catherine's possible motivation to distort the truth under hypnosis; one of the factors leading Dr. Schafer to question that motivation was the above-discussed discrepancies in her testimony.

Summing up, Dr. Schafer had no doubt as to the unreliability of hypnosis for discovering the truth of a particular matter. He warned that "hypnosis in no way is a truth serum-like experience," and concluded "there is no way of assessing the reliability of something produced in hypnosis, as such."

The prosecution neither discredited Dr. Schafer's opinion on cross-examination, nor called any expert witness of its own.

## II

While passing through periods of vogue and of disrepute, hypnosis has been practiced in one form or another for centuries.[15] Its use in legal proceedings is a relatively recent phenomenon, however, and the rules governing the admissibility of evidence induced by hypnosis are mainly found in the case law of the past two decades. The question of such admissibility has arisen primarily in two contexts: (1) efforts by the defendant to introduce, for the truth of the matter asserted, exculpatory statements made while under hypnosis; and (2) efforts by the prosecution to introduce incriminating testimony of a witness whose memory has assertedly been refreshed by hypnosis. As will appear, the law is well settled as to the former but in a state of flux as to the latter.

---

[15]For a brief summary of its history, see 9 Encyclopaedia Britannica (15th ed. 1974) Hypnosis, page 133; for more detailed historical overviews, see Gibson, Hypnosis: Its Nature and Therapeutic Uses (1977) chapter 2; Sheehan & Perry, Methodologies of Hypnosis: A Critical Appraisal of Contemporary Paradigms of Hypnosis (1976) pages 3-39; Handbook of Clinical and Experimental Hypnosis (Gordon ed. 1967) chapter 2.

## A

We begin with a brief discussion of the cases excluding evidence of the truth of statements made under hypnosis, because the reason for their rule bears closely on the present inquiry. The point has recently been adjudicated by our court. In *People v. Blair* (1979) 25 Cal.3d 640, 664 [159 Cal.Rptr. 818, 602 P.2d 738], the defendant sought to introduce, over objection, tape-recorded statements favorable to him that were made by an eyewitness while she was under hypnosis during a pre-trial interview. The trial court excluded the evidence, ruling that the statements were not admissible as past recollection recorded. On appeal the defendant conceded the latter ruling was correct,[16] but contended the statements should have been admitted in any event because they were critical to the defense and were likely to be trustworthy, citing *Chambers v. Mississippi* (1973) 410 U.S. 284, 298-302 [35 L.Ed.2d 297, 310-312, 93 S.Ct. 1038].

We unanimously rejected this contention, explaining that "the trial court's ruling did not elevate a fastidious adherence to the technicalities of the law of evidence over the right to a fair trial. For here, unlike *Chambers*, there was no solid assurance that the hearsay statements were reliable. It appears to be the rule in all jurisdictions in which the matter has been considered that *statements made under hypnosis may not be introduced to prove the truth of the matter asserted because the reliability of such statements is questionable.* While in California such statements—and those made under the influence of truth serum—may be used to establish a basis for expert opinion, the cases either state specifically or assume that they are not admissible to prove the truth of the matter therein contained. [Citations.]" (Italics added; 25 Cal.3d at p. 665.) We further rejected the defendant's claim that the circumstances of *Blair* made it likely the witness was telling the truth: "The fact that she was a neutral person and had no reason to falsify her statements under hypnosis and that she intended to tell the truth are obviously insufficient to establish reliability, especially in the light of expert testimony that *there is no way to determine if a person under hypnosis is relating actual facts.*" (Italics added; *id.* at pp. 665-666.)

As we observed in *Blair* (*id.* at p. 665), "The rule is the same in other jurisdictions." Indeed, no court has held otherwise. Thus in the leading

---

[16]A prior statement is admissible as past recollection recorded only if, inter alia, the witness testifies that it was true. (Evid. Code, § 1237, subd. (a)(3).) In *Blair* the witness was unable to so testify.

case of *Greenfield* v. *Commonwealth* (1974) 214 Va. 710 [204 S.E.2d 414, 92 A.L.R.3d 432], a defendant who had no memory of the events surrounding the crime nevertheless made statements relating to those events while hypnotized. In holding the statements inadmissible, the Virginia Supreme Court stressed that "Most experts agree that hypnotic evidence is unreliable because a person under hypnosis can manufacture or invent false statements. [Citations.] A person under a hypnotic trance is also subject to heightened suggestibility. [Citations.]" (*Id.* at p. 419.) In subsequently denying habeas corpus relief to the same defendant, the federal district court stated that "the very reason for excluding hypnotic evidence is due to its potential unreliability." (*Greenfield* v. *Robinson* (W.D.Va. 1976) 413 F.Supp. 1113, 1120.) Other courts have rejected hypnotic evidence expressly because of its lack of reliability,[17] while still others have simply declared such evidence inadmissible per se.[18]

Particularly relevant here are the cases that have excluded this evidence on the ground of the well-known *Frye* rule. (*Frye* v. *United States* (D.C. Cir. 1923) 293 F. 1013.) That rule conditions the admissibility of evidence based on a new scientific method of proof on a showing that the technique has been generally accepted as reliable in the scientific community in which it developed. (*Id.* at p. 1014.) Finding that no such showing had been made with regard to hypnosis, the Oklahoma court held in *Jones* v. *State* (Crim.App. 1975) 542 P.2d 1316, 1326-1327, that expert testimony as to the truthfulness of statements made by the defendant under hypnosis was inadmissible for the same reason that the results of lie detector and "truth serum" tests are excluded, i.e., because such tests "have not attained sufficient scientific and psychological accuracy nor general recognition as being capable of definite and certain interpretation." (*Id.* at p. 1326.)

Again, the Michigan court so held in *People* v. *Hangsleben* (1978) 86 Mich.App. 718 [273 N.W.2d 539, 543-544], declaring that the defendant's attempt to prove the reliability of statements made in hypnosis

---

[17]*Emmett* v. *State* (1974) 232 Ga. 110 [205 S.E.2d 231, 235] ("the reliability of hypnosis has not been established"); *State* v. *Harris* (1965) 241 Ore. 224 [405 P.2d 492, 498] (hypnosis "does not guarantee truthfulness"); *People* v. *Harper* (1969) 111 Ill.App.2d 204 [250 N.E.2d 5, 7] ("the scientific reliability of neither [hypnosis nor "truth serum"] is sufficient to justify the use of test results of either in the serious business of criminal prosecution").

[18]*State* v. *Pierce* (1974) 263 S.C. 23 [207 S.E.2d 414, 418]; *State* v. *Pusch* (1950) 77 N.D. 860 [46 N.W.2d 508, 521-522]; *People* v. *Ebanks* (1897) 117 Cal. 652, 665-666 [49 P. 1049].

by showing the qualifications of the hypnotist "is an inadequate foundation for scientific evidence" under the Michigan version of the *Frye* rule. (*Id.* at p. 544.) And in *Rodriguez* v. *State* (Fla.App. 1976) 327 So.2d 903, 904, the Florida court excluded such evidence under its version of *Frye*, i.e., that the reliability of a new method of proof must be generally accepted by scientists or "'have passed from the stage of experimentation and uncertainty to that of reasonable demonstrability.'" Applying this test, the court held the evidence inadmissible because it was "unconvinced of the reliability of statements procured by way of hypnosis."

### B

With this unanimous body of law in mind we turn to the second group of cases mentioned above, i.e., those addressing the admissibility of the testimony of a witness whose memory has assertedly been refreshed by hypnosis. The seminal case was *Harding* v. *State* (1968) 5 Md.App. 230 [246 A.2d 302]. There the prosecuting witness, Mildred Coley, was found wounded by the roadside, the apparent victim of an aggravated sexual assault; she was in a state of shock and could not remember anything that had happened after being shot by the defendant, who had been riding with her in a car. Several weeks later she was taken to the police barracks to be hypnotized by a psychologist from the state hospital. The police furnished the hypnotist with the details of the case, and he informed Coley he was going to "get her memory back." After he put her under hypnosis he invited two state troopers in, and directed her to tell him "everything that happened" on the day in question. She related certain events incriminating the defendant, with occasional prompting by the hypnotist. He denied suggesting to her any answers to his questions, but did give her the suggestion that after she awoke she would relate the same events. He then brought her out of the trance, and under questioning by one of the state troopers she duly gave the same answers she had given while hypnotized; the hypnotist conceded that his posthypnotic suggestion had made her "want to do so." He testified that in his opinion her story under hypnosis was reliable because certain of her statements were corroborated, because "her recall afterwards was essentially the same," and because she had "no reason" to lie. On the witness stand Coley gave the story a third time, claiming that "When I was asleep it all came back to me."

On appeal from his conviction of assault with intent to commit rape, the defendant urged that the pretrial hypnosis rendered Coley's testimo-

ny inadmissible. Affirming the judgment, the Maryland Court of Special Appeals summarily dismissed this contention on the single ground that the *witness* believed her memory of the events was accurate: "The admissibility of Mildred Coley's testimony concerning the assault with intent to rape case causes no difficulty. On the witness stand she recited the facts and stated that she was doing so from her own recollection. The fact that she had told different stories or had achieved her present knowledge after being hypnotized concerns the question of the weight of the evidence which the trier of facts, in this case the jury, must decide." (*Id.* at p. 306.)

In the ensuing 10 years these few sentences spawned a series of similar decisions permitting witnesses to testify to recollections that were assertedly refreshed by pretrial hypnosis. The Attorney General, naturally, relies heavily on those decisions in the case at bar. But an examination of the opinions discloses a significant evolution in the approach of the courts to this issue. In the earlier cases, as in *Harding*, the courts engaged in little or no analysis of the issue, and merely reiterated the general proposition that the fact of hypnosis "goes to the weight, not the admissibility" of the evidence. If they discussed the point at all, the courts simply noted that the witness believed he was testifying from his own memory and that his credibility could presumably be tested by ordinary cross-examination. (See *State* v. *Jorgensen* (1971) 8 Ore.App. 1 [492 P.2d 312, 315]; *Wyller* v. *Fairchild Hiller Corporation* (9th Cir. 1974) 503 F.2d 506, 509-510; *Kline* v. *Ford Motor Co., Inc.* (9th Cir. 1975) 523 F.2d 1067, 1069-1070; *State* v. *McQueen* (1978) 295 N.C. 96 [244 S.E.2d 414, 427]; *Clark* v. *State* (Fla.App. 1979) 379 So.2d 372, 375.)

As the decade drew to a close, however, the courts began to take notice of the dangers inherent in using hypnosis for this purpose, and developed increasingly complex procedural "safeguards" in the hope of forestalling those dangers. Thus until 1978 the Ninth Circuit Court of Appeals had applied the *Harding* rule only in civil cases (see *Wyller* and *Kline, supra*); in extending the rule in that year to criminal cases, the court warned: "We are concerned, however, that investigatory use of hypnosis on persons who may later be called upon to testify in court carries a dangerous potential for abuse. Great care must be exercised to insure that statements after hypnosis are the product of the subject's own recollections, rather than of recall tainted by suggestions received while under hypnosis." (*United States* v. *Adams* (9th Cir. 1978) 581 F.2d 193, 198-199.) In a footnote at this point the court proposed sever-

al safeguards that it apparently believed would eliminate such "potential for abuse."[19]

In *People* v. *Smrekar* (1979) 68 Ill.App.3d 379 [24 Ill.Dec. 707, 385 N.E.2d 848, 853], the Illinois Court of Appeals followed the *Harding* rule but recognized that "the use of hypnosis is not without problems. 'Asking a patient to recall only real events, or to verify aspects of the material as true or false, reduces but does not remove the element of fantasy' [citation]. The hypnotized subject is also subject to suggestion by the hypnotist." Accordingly, the court held admissible the identification testimony of a previously hypnotized eyewitness only because of a number of factors in the record which the court impliedly viewed as guaranteeing reliability.[20]

In subsequent cases the required safeguards became very elaborate indeed. Thus in *State* v. *Hurd* (1981) 86 N.J. 525 [432 A.2d 86], the eyewitness-victim was unable or unwilling to identify the defendant as her assailant, and did so only after being hypnotized three weeks later. The defendant moved before trial to suppress her proposed in-court identification, and extensive expert testimony was taken on the subject of the reliability of hypnotically induced recollection. The trial court ordered the testimony suppressed.

On appeal, the New Jersey Supreme Court held that the admissibility of hypnotically induced testimony must be judged by the *Frye* standard, but immediately qualified the rule to require only that in any case the hypnosis produce a recall that is, in effect, no more inaccurate

---

[19]"We think that, at a minimum, complete stenographic records of interviews of hypnotized persons who later testify should be maintained. Only if the judge, jury, and the opponent know who was present, questions that were asked, and the witness's responses can the matter be dealt with effectively. An audio or video recording of the interview would be helpful." (*Id.* at p. 199, fn. 12.) Although the court found those safeguards had not been observed in *Adams* and declared "we do not approve of the hypnosis methods used here" (fn. omitted; *id.* at p. 199), it nevertheless rejected the claim of error on the ground that the defendant had failed to object to the inadequate foundation.

In *United States* v. *Awkard* (9th Cir. 1979) 597 F.2d 667, 669, the court reaffirmed its holding in *Adams* and explained (at fn. 2) that the purpose of the *Adams* safeguards is "to ensure that posthypnosis statements are truly the subject's own recollections."

[20]Thus the court stressed that the hypnotist was a physician with extensive experience in using hypnosis; only he and the witness were present at the hypnotic session; although the session was not recorded, the hypnotist denied he did anything to suggest the identification to the witness; the identification was corroborated; and the witness had had ample opportunity to see the defendant at the time of the crime. (*Id.* at pp. 854-855.)

than that of the average witness who has not been hypnotized. (*Id.* at pp. 91-92.) The court recognized a number of dangers inherent in the hypnotic process which "explain why hypnosis, unless carefully controlled, is not generally accepted as a reliable means of obtaining accurate recall" (*id.* at p. 93); the dangers included the subject's extreme suggestibility, loss of critical judgment, tendency to confabulate, and excessive confidence in his new "memories." The court nevertheless declined to hold such testimony inadmissible per se, asserting that "the reliability of ordinary eyewitnesses reveals similar shortcomings." (*Id.* at p. 94.)

Yet to minimize if possible the admitted risks of hypnosis, the court went on to adopt an intricate set of procedural prerequisites to its use. First, the trial court should "evaluate both the kind of memory loss that hypnosis was used to restore and the specific technique employed, based on expert testimony presented by the parties." (*Id.* at p. 95.) The court should then inquire into "the amenability of the subject to hypnosis," because persons capable of entering deeper trances may be more suggestible. (*Id.* at p. 96.) In turn, the party offering the testimony must prove he has complied with no less than six additional procedural requirements, intended to furnish an adequate record and insure "a minimal level of reliability." (*Id.* at pp. 96-97.)[21]

Finally, in order to guarantee "strict compliance" with these prerequisites, the proponent of the testimony must establish its admissibility by "clear and convincing" proof. (*Id.* at p. 97.) "This burden," said the New Jersey court, "is justified by the potential for abuse of hypnosis, the genuine likelihood of suggestiveness and error, and the consequent risk of injustice." (*Ibid.*)[22] Because the court found that several of the

---

[21]The six requirements, suggested by Dr. Orne, are set out at pages 96-97 of 432 A.2d. They may be summarized as follows: (1) the hypnotist must be a psychiatrist or psychologist experienced in the use of hypnosis; (2) to avoid bias, the hypnotist must be independent of the prosecution or defense; (3) all information the police or defense give the hypnotist before the session must be recorded; (4) before the session the subject must describe in detail to the hypnotist the facts as he remembers them, and the hypnotist must avoid influencing that description; (5) all contacts between the hypnotist and the subject—i.e., the prehypnotic examination, the hypnotic session, and the posthypnotic interrogation—must be recorded, preferably on videotape; and (6) no person other than the hypnotist and the subject may be present during the session, or even during the prehypnotic examination and the posthypnotic interrogation.

[22]Two justices refused to join in this opinion, believing that hypnotically induced testimony should not be admitted in a criminal trial under any circumstances: "To do so would have the defendant's innocence or guilt depend on the jury's speculating, on the basis of conflicting scientific-medical testimony, whether the identification was true recollection or implanted by the hypnosis." (*Id.* at p. 98 [conc. opn. of Sullivan, J.].)

listed procedural requirements had not been met on the record in *Hurd*, it affirmed the order suppressing the proposed testimony.[23]

## C

After careful consideration, we decline to join in the foregoing effort to develop a set of "safeguards" sufficient to avoid the risks inherent in admitting hypnotically induced testimony. To begin with, we are not persuaded that the requirements adopted in *Hurd* and other cases will in fact forestall each of the dangers at which they are directed.[24] Next, we observe that certain dangers of hypnosis are not even addressed by the *Hurd* requirements: virtually all of those rules are designed to prevent the hypnotist from exploiting the suggestibility of the subject; none will directly avoid the additional risks, recognized elsewhere in *Hurd*, that the subject (1) will lose his critical judgment and begin to credit "memories" that were formerly viewed as unreliable, (2) will confuse actual recall with confabulation and will be unable to distinguish between the two, and (3) will exhibit an unwarranted confidence in the validity of his ensuing recollection. (432 A.2d at pp. 93-94.) The Attorney General proposes no "safeguards" to deal with these knotty problems.

Lastly, even if requirements could be devised that were adequate in theory, we have grave doubts that they could be administered in practice without injecting undue delay and confusion into the judicial process. To be sure, it would usually be easy to determine if the hypnotist was an appropriately trained psychiatrist or psychologist. It might be harder to establish that he was sufficiently independent of the prosecution or defense to avoid subconscious bias. And it would certainly be far more difficult to prove strict compliance—which *Hurd* demands—

---

[23]Two New York trial courts have adopted an even more elaborate set of *nine* prerequisites to the admissibility of such testimony, derived from an unreported but widely cited ruling of a Wisconsin trial court in 1979. (*People* v. *Lewis* (1980) 103 Misc.2d 881 [427 N.Y.S.2d 177]; *People* v. *McDowell* (1980) 103 Misc.2d 831 [427 N.Y.S.2d 181].)

[24]For example, one of the requirements set forth in *Hurd* is that all contacts between the hypnotist and the subject must be recorded, for the stated purpose of enabling the trial court to determine what "cues" the hypnotist may have conveyed to the subject by word or deed; and the opinion strongly encouraged the use of videotape to make such recordings. (432 A.2d at p. 97.) Yet as the same opinion recognizes elsewhere (at p. 93), "Because of the unpredictability of what will influence a subject, it is difficult even for an expert examining a videotape of a hypnotic session to identify possible cues." If even an expert cannot confidently make that identification, it is vain to believe that a layman such as a trial judge can do so.

with each of the remaining "safeguards." It strains credulity, for example, to believe that a conscientious defense counsel would meekly agree that the prosecution had recorded every bit of relevant information conveyed to the hypnotist prior to the session, or that the hypnotist had conveyed absolutely none of that information to the subject either while extracting the latter's prehypnotic version of the facts or while questioning him both during and after hypnosis, or that every single contact between the hypnotist and the subject, no matter how innocuous, had been preserved on videotape.[25]

On the other hand, it takes little prescience to foresee that these and related issues would provide a fertile new field for litigation. There would first be elaborate demands for discovery, parades of expert witnesses, and special pretrial hearings, all with concomitant delays and expense. Among the questions our trial courts would then be expected to answer are scientific issues so subtle as to confound the experts. (See, e.g., fn. 24, *ante.*) Their resolution would in turn generate a panoply of new claims that could be raised on appeal, including difficult questions of compliance with the "clear and convincing" standard of proof. And because the hypnotized subject would frequently be the victim, the eyewitness, or a similar source of crucial testimony against the defendant, any errors in ruling on the admissibility of such testimony could easily jeopardize otherwise unimpeachable judgments of conviction. In our opinion, the game is not worth the candle.

For all these reasons, we join instead a growing number of courts that have abandoned any pretense of devising workable "safeguards" and have simply held that hypnotically induced testimony is so widely viewed as unreliable that it is inadmissible under the *Frye* test. This disposition, of course, is consistent with the above-discussed case law uniformly excluding evidence of the truth of statements made under hypnosis. (See pt. II A, *ante.*) And both rules, as we shall see, are supported by the overwhelming consensus of contemporary scientific opinion on hypnosis.

The first case to depart from the *Harding* approach was *People* v. *Hangsleben* (1978) *supra*, 273 N.W.2d 539. There, after he had confessed, the defendant was hypnotized and assertedly recalled the events

---

[25]The requirement that the prehypnotic examination, the hypnotic session, and the posthypnotic interrogation all be videotaped would make it difficult, moreover, to comply with the further requirement that the hypnotist and the subject be completely alone during each of those phases.

of the crime for the first time, stating that a third party was the true culprit. He sought to prove at trial that the 'hypnosis had refreshed his recollection, in order to bolster his story on the witness stand and to explain his prior inconsistent admission to the police. The Michigan court distinguished *Harding*, and held that the evidence was properly excluded because the defendant "failed to establish the reliability of hypnosis as a memory-jogging device." (*Id.* at p. 544.) His sole showing was to assert the qualifications of the hypnotist and to refer to the theory of memory restoration by hypnosis. Ruling "That does not demonstrate the general scientific acceptance" required by the Michigan version of the *Frye* test, the court rejected the evidence for lack of proof that hypnosis has been successful in restoring the memory of others, either by their testimony or that of experts. (*Id.* at p. 545.)

In *State* v. *La Mountain* (1980) 125 Ariz. 547 [611 P.2d 551], it was the prosecution that failed to prove the reliability of hypnosis used to restore a witness' recollection. The defendant was convicted of sexually assaulting a customer in a laundromat. At trial, two prosecution witnesses identified the defendant as the person who committed a similar assault in the same laundromat fifteen months earlier; one was the victim of that assault, and the other was a bystander who seized the assailant. Both witnesses, however, had been unable to identify the defendant from a photographic lineup until their memories were "refreshed" by hypnosis. The hypnotist was a deputy sheriff who had attended various law enforcement institutions giving instruction in hypnotism. He used a so-called "TV technique," asking the subject to visualize the events of the crime as if they were being played back on a videotape machine.

On appeal, the Arizona Supreme Court held it was error to allow the two witnesses to the prior assault to testify after they had been hypnotized. The court reasoned (at p. 555), "There was no expert testimony regarding the effect of hypnosis upon a person's memory, and we do not know from the record what effect the previous hypnotic identification had on the witness's later in-court testimony and identification. Although we perceive that hypnosis is a useful tool in the investigative stage, we do not feel the state of the science (or art) has been shown to be such as to admit testimony which may have been developed as a result of hypnosis. A witness who has been under hypnosis, as in the case here, should not be allowed to testify when there is a question that the testimony may have been produced by that hypnosis." The court never-

theless affirmed the judgment, finding from the evidence that the result would have been the same if these witnesses had not testified.

The gap in proof identified in *Hangsleben* and *La Mountain* was quickly and thoroughly filled in the leading case of *State v. Mack* (Minn. 1980) 292 N.W.2d 764. In that case the defendant met Marion Erickson in a bar, and eventually took her to a motel on his motorcycle. Thereafter he telephoned for an ambulance and told the drivers that he and Erickson had been engaged in intercourse when she started bleeding from the vagina. Erickson was drunk, her speech was unclear, and she had difficulty walking. At the hospital a single deep cut was found inside her vagina; she told one intern that fingers had been inserted in her vagina during sexual activity, and another that she had been in a motorcycle accident. After the doctors advised her they did not believe her explanations, she reported to the police that she had been assaulted. She could not, however, remember much of the events of the night in question.

Six weeks later the police caused Erickson to be hypnotized by a lay hypnotist without professional training. After placing her in a deep trance, the hypnotist invited the police investigator and another officer to join them. He then told Erickson that she would recall the events as though on a television screen. In the course of the session Erickson accused the defendant of stabbing her repeatedly in the vagina. At the end of the session the hypnotist gave her a posthypnotic suggestion to the effect that she would be able to remember very clearly everything that happened on the night in question. The next day she gave the same police investigator a written statement recounting as her present memory the events she had related under hypnosis.

The defendant was arrested and charged with aggravated sexual assault. The question of the admissibility of Erickson's proposed testimony was litigated at an extensive pretrial hearing. Following that hearing, and pursuant to Minnesota procedure, the trial court stayed the prosecution and certified to the state supreme court the question "whether a previously hypnotized witness may testify in a criminal proceeding concerning the subject matter adduced at the pretrial hypnotic interview." (292 N.W.2d at p. 765.) In a well-reasoned opinion the Minnesota high court unanimously answered in the negative, holding such testimony inadmissible as a matter of law.

The court began by emphasizing that no less than five experts on hypnosis and memory retrieval had testified at the hearing, making an extensive record on which to decide the legal issue. The court also observed that the record "demonstrates the truth of Dr. Orne's observation that a case-by-case decision on the admissibility question would be prohibitively expensive, and reveals the difficulty of getting experts qualified to testify about hypnosis as an investigative rather than a therapeutic tool." (*Id.* at p. 766.)

The defendant in *Mack* contended that Erickson's hypnotically refreshed recollection was too unreliable to merit admission, and that to allow such testimony would deny him the right to effective cross-examination. The state contended that the testimony should be admitted as long as certain "safeguards" can be established, relying on *Harding* and its progeny; the defendant, in turn, invoked *Frye*. The state argued that *Frye* is inapplicable to evidence that is not the direct product of a mechanical device such as a lie detector; and to be admissible, the testimony of a previously hypnotized witness need not be true provided it is based on what the witness actually perceived. Stressing the potentially drastic effect of hypnosis on a witness' testimony, however, the court ruled that "Although hypnotically-adduced 'memory' is not strictly analogous to the results of mechanical testing, we are persuaded that the *Frye* rule is equally applicable in this context" (*id.* at p. 768).[26]

The court turned to the record to determine whether, under *Frye*, the use of hypnosis to refresh a witness' memory has been generally accepted as reliable by the scientists working in the field. The court found that the exact opposite is true, i.e., that the consensus of informed expert opinion rejects the use of hypnosis for this purpose because it is "not scientifically reliable as accurate." (*Id.* at p. 768.)

The court gave a number of reasons for this conclusion, each drawn from the expert testimony before it. (*Id.* at p. 768.) First, "a hypnotized subject is highly susceptible to suggestion, even that which is subtle and unintended. Such suggestion may be transmitted either during the hypnotic session or before it," by such persons as police officers or doctors.

---

[26]Echoing scholarly criticism, the court rejected *Harding* on the ground that it was the product of gullible witnesses and courts uninformed about the scientific realities of hypnosis. (*Id.* at pp. 770-771.)

This suggestibility is enhanced by the subject's natural "desire to please either the hypnotist or others who have asked the person hypnotized to remember and who have urged that it is important that he or she remember certain events."[27] The result is that "hypnosis can create a memory of perceptions which neither were nor could have been made" (*id.* at p. 769). And "Most significantly, there is no way to determine from the content of the 'memory' itself which parts of it are historically accurate, which are entirely fanciful, and which are lies." (*Id.* at pp. 768-769.)

The expert testimony also supported the defendant's claim of denial of effective cross-examination: "In addition to its historical unreliability, a 'memory' produced under hypnosis becomes hardened in the subject's mind. A witness who was unclear about his 'story' before the hypnotic session becomes convinced of the absolute truth of the account he made while under hypnosis. This conviction is so firm that the ordinary 'indicia of reliability' are completely erased, . . . It would be impossible to cross-examine such a witness in any meaningful way." (Fn. omitted; *id.* at p. 769.)

Summing up, the court recognized but declined to perpetuate the two inconsistent lines of cases discussed hereinabove (pts. II A and II B, *ante*): "We follow the best scientific authority, however, in rejecting as artificial and unprincipled any distinction between hypnotically-induced testimony offered by the defense to exculpate and that offered by the prosecution to make its case. Regardless of whether such evidence is offered by the defense or by the prosecution, a witness whose memory has been 'revived' under hypnosis ordinarily must not be permitted to testify in a criminal proceeding to matters which he or she 'remembered' under hypnosis." (*Id.* at p. 771.)[28]

Because the precise question certified to the Minnesota Supreme Court in *Mack* was limited to the admissibility of a previously hypno-

---

[27] It is also enhanced by the subject's psychological "need to 'fill gaps.' When asked a question under hypnosis, rarely will he or she respond, 'I don't know.'" (*Id.* at p. 768.)

[28] The court added that hypnosis could continue to be used as an investigative tool, i.e., to help a subject remember verifiable facts that can serve as "leads" for further investigation of the crime—such as a license plate number—"as long as the material remembered during hypnosis is not subsequently used in court as part of an eyewitness' testimony." (*Ibid.*) The court warned, however, that even when a witness is hypnotized for that investigative purpose alone, the session must be conducted under safeguards adequate "to assure the utmost freedom from suggestion" in the event the witness is later called to testify to "recollections *recorded before* the hypnotic interview." (Italics added; *ibid.*) In a footnote at this point the court "note[d], without adopting," the safeguards recommended by Dr. Orne. (See fn. 21, *ante*.)

tized witness' testimony on the subject matter of the hypnotic session, the court did not resolve the larger question whether such a witness should be allowed to testify on other matters relating to the crime that were not expressly covered in the hypnotic session and were allegedly recalled without the aid of hypnosis. The latter question was soon answered, again in the negative.

In *People* v. *Tait* (1980) 99 Mich.App. 19 [297 N.W.2d 853], the defendant was charged with assaulting Deputy Sheriff Myers with intent to commit murder. At the preliminary hearing Myers testified that the defendant approached him, raised a pistol, and twice threatened to blow his head off; when the defendant ignored his orders to stop and came nearer, Myers shot him. At trial Myers told the same story, with one difference: whereas at the preliminary hearing he had testified that he did not see the defendant attempt to fire the pistol, at trial he testified that just before he shot the defendant he saw the latter move his hand to the top of the weapon. Defense counsel moved for a mistrial, stating he had not learned that Myers' memory had been refreshed by pretrial hypnosis until he so testified. The hypnotist had been the prosecuting attorney. Myers claimed that at the hypnotic session no one told him what to say, and that his trial testimony was his own recollection of the incident. The trial court denied the motion, and the defendant was convicted.

Reversing the judgment, the Michigan court began by recalling its 1978 decision in *Hangsleben, supra*, which held similar testimony inadmissible. The People argued that the *Frye* rule was inapplicable in this context because the witness' recollection was merely "refreshed" as permitted by law. The court rejected this contention, warning that "Investigatory use of hypnosis on persons who are later called on to testify in court carries a dangerous potential for abuse." (*Id.* at p. 856.) The court then held the case governed by the Michigan version of the *Frye* rule, to wit, that "general scientific recognition [must] be established by testimony of disinterested and impartial experts or disinterested scientists whose livelihood was not intimately connected with the technique. [¶] In the instant case the technique is not new, but we believe the same requirements must be met as are required for the introduction of lie detector or voicewriter evidence or evidence influenced by them." (*Id.* at p. 857.) Applying that test, the court held (*ibid.*) that "Hypnosis has not 'achieved that degree of general scientific acceptance' which will permit its introduction," citing inter alia our decision in *People* v. *Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240].

The question of disposition remained. The *Frye* error, noted the court, was compounded by the prosecution's failure to disclose before trial the fact that the witness had been hypnotized to restore his memory. The court then concluded, "By virtue of the prosecutor's improper actions in this case, deputy sheriff Kirk Myers' testimony has been *damaged to the extent that it cannot be used on retrial* of the case. In lieu of discharge, the case is remanded for retrial, but the prosecution shall be absolutely prohibited from in any way using *any* testimony of deputy sheriff Myers. The trial court is adjured to permit *no testimony of any kind as to what Myers may have seen or heard.*" (Italics added; 297 N.W.2d at p. 857.)

Any inference, however, that prosecutorial impropriety is a precondition to exclusion of the testimony of a previously hypnotized witness was firmly dispelled in the recent Arizona case of *State v. Mena.* There Stephen Koors was stabbed outside a bar by three men. Sometime later he went with a police officer to see two doctors who hypnotized him for the purpose of improving his memory of the assault. The doctors questioned him about the incident, and his answers contained more details than the statements he had previously given to the police. Before terminating the session the doctors told him that after he came out of hypnosis he would remember what he had related to them in the trance. At trial, the defendant moved to exclude Koors' testimony unless it could be shown that his memories of the event were his own recollection and not implanted by suggestions of the hypnotists. The motion was denied and the defendant was convicted.

At the first level of review the Arizona Court of Appeal affirmed the judgment, relying on the "respectable authority" of *Harding* and its progeny to find no fundamental error. (*State v. Mena* (App. 1980) 128 Ariz. 244 [624 P.2d 1292, 1294].) Declining in effect to apply the *Frye* rule, the court reasoned that "hypnotically adduced evidence cannot be equated with, for example, the results of a lie detector examination since one can cross-examine the witness but cannot cross-examine the lie detector." (*Ibid.*)

On further review, however, the Arizona Supreme Court rejected both the authority and the reasoning of the court of appeal, vacated the portion of its opinion dealing with hypnosis, and reversed the assault conviction. (*State v. Mena* (1981) 128 Ariz. 226 [624 P.2d 1274].) The heart of its decision is a careful inquiry into the scientific realities of hypnosis and its effect on potential witnesses. In that inquiry the court

relied on a number of scholarly articles as support for conclusions identical to those drawn in *Mack* from expert testimony: i.e., persons under hypnosis are prone to experience false memories, fantasies, and confabulations; these distortions are aggravated by the subject's tendency to respond in the way he believes the hypnotist desires, even without the awareness of either; the subject is unable to distinguish his true memories from pseudomemories implanted during hypnosis; and after hypnosis he will often be more convinced of the accuracy of the latter than the former, making cross-examination ineffective. (*Id.* at pp. 1276-1278.) On these grounds the court discredited *Harding* and its progeny, and instead quoted with approval from the above-discussed opinion in *Tait*.

The court then reiterated the Arizona version of the *Frye* rule (citing inter alia *People* v. *Kelly* (1976) *supra*, 17 Cal.3d 24), and stated, "We believe that the same standard should apply to the use of hypnosis to produce testimony by purportedly improving memory." (624 P.2d at p. 1279.) Applying the rule in this context, the court found that although hypnosis has certain approved therapeutic uses, its use "to aid in accurate memory recall is not yet generally accepted." (*Ibid.*) Reaffirming the holding of its 1980 decision in *La Mountain, supra*, the court therefore concluded (*ibid.*): "The determination of the guilt or innocence of an accused should not depend on the unknown consequences of a procedure concededly used for the purpose of changing in some way a witness' memory. Therefore, until hypnosis gains general acceptance in the fields of medicine and psychiatry as a method by which memories are accurately improved without undue danger of distortion, delusion or fantasy, we feel that testimony of witnesses which has been tainted by hypnosis should be excluded in criminal cases."

In the course of its opinion the court quoted the published view of Dr. Bernard L. Diamond that a witness who has been hypnotized for the purpose of improving his memory is so contaminated that he is thereafter incompetent to testify. (*Id.* at p. 1277.) In its disposition the court adopted that view and the corresponding holding of *Tait*, ruling that after Koors had been hypnotized it was prejudicial error to allow him to testify at all. The court explained (at p. 1280) that "it will often be difficult to determine whether proferred testimony has been produced by hypnosis or has come from the witness' own memory, unaffected by hypnotic suggestion. In order to ensure against the dangers of hypnosis, therefore, this Court will consider testimony from witnesses who have been questioned under hypnosis regarding the subject of their offered

testimony to be *inadmissible in criminal trials from the time of the hypnotic session forward.*" (Italics added.) In a footnote at this point the court recognized that "our decision today may place the state in the difficult position of choosing whether to use a particular witness' testimony at a criminal trial or to subject that witness to hypnotism as an investigatory tool. We do not pass at this time on the state's ability to preserve a witness' prehypnotic testimony" by means of deposition.[29]

With the next case in this series, we come full circle. As we have seen, the sequence began in 1968 with the decision of the Maryland Court of Special Appeals in *Harding*; but in *Polk v. State* (1981) 48 Md.App. 382, [427 A.2d 1041], the same court has now repudiated *Harding* and held instead that *Frye* governs the question before us. This dramatic turn of events would appear to give the coup de grace to the moribund precedent relied on here by the Attorney General.

In *Polk* the defendant was charged with orally copulating an eight-year-old boy named Bobby, his next-door neighbor. Some five months after the incident Bobby was taken to the state police barracks to be hypnotized by Sergeant White, a police investigator with minimal experience in hypnosis. Before the session began White was advised that the goal was to determine whether Bobby could remember any sexual contact with this defendant. Bobby's mother and the prosecuting attorney were present during the session. Under White's questioning, Bobby produced details of the alleged misconduct. The defendant moved before trial to suppress the testimony of Bobby and White on the ground that it would be the product of "an inexact and unproven science" and hence was inadmissible as a matter of law. Counsel also contended that White was not qualified as a hypnosis expert, his questions to Bobby were improperly suggestive, and there was an impermissible delay be-

---

[29]The Arizona Supreme Court returned to the subject in a pair of later opinions. In *State of Arizona* ex rel. *Collins v. Superior Court* (Jan 7, 1982) 644 P.2d 1266 (*Collins I*) the court reiterated in detail the *Mena* holdings that hypnotically induced testimony is inadmissible under the *Kelly-Frye* rule and impairs the constitutional right of confrontation. The court also held that no amount of procedural "safeguards" could make such testimony sufficiently reliable to be admitted, but allowed the limited use of hypnosis for investigative purposes. Following a change of personnel, the court granted a rehearing and filed a "supplemental opinion" by a different author. (*State of Arizona* ex rel. *Collins v. Superior Court* (May 4, 1982) 644 P.2d 1279 (*Collins II*).) In the supplemental opinion the court reaffirmed at length the foregoing principal holdings of *Mena* and *Collins I*, but by a bare majority allowed a witness who has undergone pre-trial investigative hypnosis to testify to facts he remembered before being hypnotized, provided there is compliance with certain "safeguards." (*Id.*, at pp. 1295-1296.) The author of *Collins I* dissented on the latter point for a number of scientific and practical reasons that we find persuasive. (*Id.* at pp. 1297-1299.)

tween the incident and the hypnotic session. The trial court denied the motion, asserting that the fact of hypnosis goes to the weight rather than the admissibility of the testimony. This, of course, was the rule in Maryland since *Harding.*

Bobby's testimony at trial was substantially the same as the answers he gave under hypnosis. On cross-examination he stated he had no recollection of the incident and "forgot the nasty part" until he spoke with White. The prosecution did not call White, however, and did not introduce evidence of the hypnosis. For that reason the court refused to allow a defense expert to testify that hypnotically refreshed recollection is unreliable and White's hypnotic procedure was improper. The defendant's motions to strike Bobby's testimony and for acquittal or mistrial were denied, and he was convicted.

The appellate court acknowledged that Bobby's testimony would have been admissible under its 1968 decision in *Harding,* but held that decision had been undermined 10 years later when Maryland first adopted the *Frye* rule in the case of *Reed* v. *State* (1978) 283 Md. 374 [391 A.2d 364, 97 A.L.R.3d 201]. The court in effect distinguished away *Harding* on the following rationale: "In *Harding,* we did not assess the *Frye* principle, the rule there enunciated not having been applied in this State until *Reed*; nor did we have occasion to probe the question—here directly raised on the authority of *Reed*—of the general acceptability of hypnotism as a reliable technique for memory retrieval within the relevant scientific community." (Fns. omitted; 427 A.2d at p. 1047.)[30]

To answer that question, the court quoted at length from both *Mack* and *Mena* (and cited *Tait* as being in accord), stressing their reliance on the *Frye* rule in judging the admissibility of hypnotically refreshed recollection. The court then reasoned (*id.* at p. 1048): "*Reed* speaks, of course, of expert testimony based upon the use of a scientific technique. The technique of hypnosis is scientific, but the testimony itself of the witness is the end product of the administration of the technique. The induced recall of the witness is dependent upon, and cannot be disassociated from, the underlying scientific method. Accordingly, we conclude, as did the Minnesota and Arizona Courts, that the *Frye* test must be applied in the instant case, *i.e.,* before Bobby's testimony can be admitted, there must be a determination of whether hypnosis is generally acceptable in the relevant scientific community for the purpose of memory retrieval."

---

[30]Only the year before the same court had rejected the same argument, i.e., that the *Reed-Frye* rule undermined *Harding.* (*State* v. *Temoney* (1980) 45 Md.App. 569 [414 A.2d 240, 244].)

Because that determination had been precluded below by the refusal to allow the defendant to prove the unreliability of hypnosis, the court reversed and remanded with directions to the trial judge to rule in the first instance on the general acceptability of this technique as shown by expert testimony and scholarly publications. Finally, adopting the *Mena* rule of total disqualification of any witness thus contaminated, the court also directed that if the technique is found inadmissible under *Frye*, Bobby must not be allowed to testify at all on the retrial "since the boy had no recollection of the alleged incident giving rise to the charges against the appellant *prior* to the hypnosis. *State v. Mena, supra.*" (*Id.*, 427 A.2d at p. 1049.)

In *Com. v. Nazarovitch* (1981) 496 Pa. 97 [436 A.2d 170], the Supreme Court of Pennsylvania not only joined the foregoing line of decisions barring hypnotically induced testimony, but expressly refused to follow *Hurd* in its attempt to sanitize such evidence by procedural "safeguards." The defendants in *Nazarovitch* were charged with murder on the basis of statements by a witness whom the police had caused to be hypnotized on three occasions prior to trial in an effort to refresh her memory of the events. Law enforcement officials were present during each hypnotic session, and furnished some of the questions asked of the witness. The defendants' pretrial motion to suppress the witness' testimony was granted, and the prosecution appealed.

In a unanimous opinion, the Pennsylvania high court held such testimony inadmissible and affirmed the suppression order. The court began by ruling that the admissibility of the challenged testimony must be judged by the *Frye* test, i.e., "whether hypnotically-refreshed testimony is generally accepted in the scientific community as yielding reasonably reliable results." (*Id.* at p. 173.) As in *Mena*, the court answered the question by examining the published views of leading representatives of that community. From such studies the court concluded, as in both *Mena* and *Mack*, that the scientific community has "grave misgivings" about the reliability of hypnosis in forensic use, for a number of reasons inherent in the phenomenon itself: i.e., "the heightened suggestivity, the increased desire to satisfy the hypnotist, the tendency to confabulate, and the inability to distinguish in one's waking state the fact from the fantasy" (*id.* at p. 174). "Furthermore," the court observed, "the hypnotic subject, upon awakening, is often imbued with a confidence and conviction as to his memory which was not present before. Prehypnosis uncertainty becomes molded, in light of additional recall experienced under hypnosis, into certitude, with the subject unaware of any sugges-

tions that he acted upon or any confabulation in which he engaged. The subject's firm belief in the veracity of his enhanced recollection is honestly held, and cannot be undermined through cross-examination." (*Ibid.*)

The court then carefully reviewed the reasoning and holding of its sister state in *Hurd*, but refused to accede to the urging of the prosecution that it adopt such an approach in Pennsylvania. Rather, the court explained, "we remain unconvinced that the trier of fact could do anything more than speculate as to the accuracy and reliability of hypnotically-refreshed memory. The *Hurd* court's rationale that hypnotically-refreshed recollection might as well be admissible since ordinary eyewitness accounts are also vulnerable to error and inaccuracies does not do full justice to the fact that 'the traditional guaranties of trustworthiness as well as the jury's ability to view the demeanor of the witness are wholly ineffective to reveal distortions of memory induced by the hypnotic process.' [Citation.] It is unchallenged that a jury can more critically analyze a witness' ability to perceive, remember, and articulate his recollections when such testimony has not been hypnotically-refreshed. The probative worth of the hypnotically-adduced evidence cannot overcome the serious and fundamental handicaps inherent therein." (*Id.* at pp. 176-177; accord, *State* v. *Palmer* (1981) 210 Neb. 206 [313 N.W.2d 648, 653-655] [rejecting *Hurd* and holding hypnotically induced testimony inadmissible for lack of general scientific acceptance]; *People* v. *Gonzales* (1981) 108 Mich.App. 145 [310 N.W. 2d 306, 308-314] [same].)

### III

From the foregoing cases it appears that the correct analysis of the problem before us is to determine whether hypnotically recalled testimony is subject to the California version of the *Frye* rule, and if so, whether it meets the test of that rule. We proceed to such an analysis.

### A

The *Frye* rule is deeply ingrained in the law of this state. It has repeatedly been invoked by our courts to determine the admissibility of evidence based, for example, on polygraph examinations (*People* v. *Wochnick* (1950) 98 Cal.App.2d 124, 127-128 [219 P.2d 70]), "truth serum" (*People* v. *Jones* (1959) 52 Cal.2d 636, 653 [343 P.2d 577]), Nalline testing (*People* v. *Williams* (1958) 164 Cal.App.2d Supp. 858, 860-862 [331 P.2d 251]), experimental systems of blood typing (*Hun-*

*tingdon* v. *Crowley* (1966) 64 Cal.2d 647, 653-656 [51 Cal.Rptr. 254, 414 P.2d 382]), voiceprint analysis (*People* v. *Kelly* (1976) *supra*, 17 Cal.3d 24), human bite marks (*People* v. *Slone* (1978) 76 Cal.App.3d 611, 623-625 [143 Cal.Rptr. 61]), and microscopic identification of gunshot residue particles (*People* v. *Palmer* (1978) 80 Cal.App.3d 239, 250-255 [145 Cal.Rptr. 466, 1 A.L.R.4th 1056]). We recently reviewed the several reasons for this rule in *Kelly* (17 Cal.3d at pp. 31-32), and need not repeat them here; it is enough to note our conclusion (*id.* at p. 32) that "we are persuaded by the wisdom of, and reaffirm our allegiance to, the *Frye* decision and the 'general acceptance' rule which that case mandates."

The Attorney General contends the *Frye* rule is inapplicable in the present context, making in essence the following argument: The rule is assertedly limited to cases in which (1) an expert witness gives his opinion (2) interpeting the results of a new technique for scientifically testing or analyzing physical evidence, and (3) that opinion goes directly to the existence or nonexistence of a disputed fact, which is often the ultimate issue in the litigation. By contrast, in cases such as the present it is not the expert (i.e., the hypnotist) who ordinarily testifies; the process involved (i.e., the hypnotizing of a potential witness to improve his recall) has nothing to do with testing physical evidence; if the expert does testify, he should not be asked to interpret the results of the technique (i.e., to give his opinion on whether the revived memories of the hypnotized subject are true) but simply to discuss its methodology (i.e., to explain how the hypnotic session was conducted); and the latter testimony evidently does not go to the disputed fact or ultimate issue (e.g., the identity of the culprit). Rather, in the typical case the witness is the person who actually perceived the event that is the subject of the litigation, and his testimony is the same as that of any other lay witness, i.e., he states his present recollection of that event to the best of his ability. It is true that his recollection has been refreshed by hypnosis, and that hypnosis does not guarantee truthful or accurate recall. But neither does any other method of reviving memory. That guarantee, as with all witnesses, comes from cross-examination, which permits the trier of fact to determine the truth and accuracy of the hypnotically refreshed testimony.[31]

---

[31]On the assumption that *Frye* is inapplicable, the Attorney General contends the only issue is whether the use of hypnosis in this case was an impermissibly suggestive pretrial procedure that tainted Catherine's subsequent testimony, citing the *Wade-Neil* rule. (*United States* v. *Wade* (1967) 388 U.S. 218 [18 L.Ed.2d 1149, 87 S.Ct. 1926]; *Neil* v. *Biggers* (1972) 409 U.S. 188 [34 L.Ed.2d 401, 93 S.Ct. 375].) Finding that defendant did not sustain his burden of proof under that rule, the Attorney General concludes the testimony was admissible.

The argument is unpersuasive for a number of reasons. First, it proceeds from an unduly narrow reading of the opinions invoking the *Frye* rule: as we said in *Kelly*, for example, the rule applies to evidence "developed by" or "based upon" new scientific techniques. (17 Cal.3d at p. 31.) Nor are those techniques necessarily limited to manipulation of physical evidence: we do not doubt that if testimony based on a new scientific process operating on purely psychological evidence were to be offered in our courts, it would likewise be subjected to the *Frye* standard of admissibility. In either case, the rule serves its salutary purpose of preventing the jury from being misled by unproven and ultimately unsound scientific methods. (*Kelly*, at pp. 31-32.)

Moreover, from the unchallenged expert testimony in the case at bar and the uniform findings of the jurisdictions that have inquired into the matter, it appears that hypnotizing a witness to improve his memory is not in fact like "any other method" of refreshing a witness' recollection. These sources reveal that the hypnotic process does more than permit the witness to retrieve real but repressed memories; it actively contributes to the formation of pseudomemories, to the witness' abiding belief in their veracity, and to the inability of the witness (or anyone else) to distinguish between the two. In these circumstances, as noted above, the resulting recall of the witness "is dependent upon, and cannot be disassociated from" the underlying hypnosis. (*Polk* v. *State* (1981) *supra*, 427 A.2d at p. 1048.) And if the testimony is thus only as reliable as the hypnotic process itself, it must be judged by the same standards of admissibility.

The question has in any event been decided in California. In *People* v. *Diggs* (1980) 112 Cal.App.3d 522 [169 Cal.Rptr. 386], the court held *Kelly* applicable in this context on essentially the same reasoning: "In view of the modification of memory and demeanor which generally follow from treatment by hypnosis, we are persuaded that posthypnotic testimony may in many instances properly be termed a product of the technique. The admissibility of evidence based upon a new scientific technique is governed by *People* v. *Kelly* .... [¶] The *Kelly* court was concerned with and sought to mitigate the dangerous tendency of lay jurors to give considerable and often undue weight to scientific evidence presented by experts with impressive credentials. (17 Cal.3d, at p. 31.) Such procedures are invested with a "'misleading aura of certainty which often envelops a new scientific process, obscuring its currently ex-

perimental nature.'" (17 Cal.3d at p. 32.) This is certainly true of hypnosis." (112 Cal.App.3d at pp. 530-531.) ■ ■■■ We approve this portion of *Diggs*.[32]

■ In accord, therefore, with the courts of Michigan, Minnesota, Arizona, Maryland, and Pennsylvania, we hold that in this state the testimony of witnesses who have undergone hypnosis for the purpose of restoring their memory of the events in issue cannot be received in evidence unless it satisfies the *Frye* standard of admissibility.

### B

It is the proponent of such testimony, of course, who has the burden of making the necessary showing of compliance with *Frye*, i.e., of demonstrating by means of qualified and disinterested experts that the new technique is generally accepted as reliable in the relevant scientific community. (*Kelly*, at pp. 36-40.) In the case at bar the prosecution did not take up that burden, and made no such showing. On this ground alone we would ordinarily be justified in holding the challenged testimony inadmissible. But while such a ruling would dispose of the appeal before us, it would provide the bench and bar with little guidance in other litigation presenting the same questions. Moreover, in the particular circumstances of this case the prosecution had little if any opportunity to make the required showing.[33] We therefore reach the

---

[32] In *Diggs* the Court of Appeal went on to hold, however, that on the record before it "there was an adequate showing to establish the admissibility of [the witness'] posthypnotic testimony under *Kelly*" (*id.* at p. 531). This appears to be a misreading of the requirements of *Kelly*, and therefore of *Frye*. According to the Court of Appeal, the psychiatrist who hypnotized the witness gave as his opinion that hypnotically enhanced testimony is reliable, while Dr. Bernard Diamond gave a contrary opinion, "bolstered by the introduction of several corroborating affidavits by other experts in the field." (*Id.* at p. 530.) The court nevertheless deemed this conflict immaterial, reasoning that "Dr. Diamond's testimony to the contrary, it seems that the lower court here was presented with sufficient evidence of the reliability of the method used" (*id.* at p. 531). Thus the court apparently believed that *Kelly-Frye* is satisfied whenever there is "sufficient evidence" from which the trial court could find that hypnotic memory enhancement is reliable—and under normal rules of proof the testimony of one witness is enough for this purpose, despite contradictory testimony. (See Evid. Code, § 411.)

Yet the *Kelly-Frye* requirement is not fulfilled merely by evidence that one expert personally believes the challenged procedure is reliable; the court must be able to find that the procedure is generally accepted as reliable by the larger scientific community in which it originated. (*Kelly*, at pp. 30-32, 37.) It is obvious that no such finding could be made on the record in *Diggs*. To that extent, accordingly, the decision is disapproved.

[33] At the time of trial (June 1979) neither *Diggs* nor the leading out-of-state cases applying *Frye* in this context had yet been decided. The prevailing rule in other jurisdictions was still that of *Harding* and its progeny, i.e., the fact of hypnosis "goes to the

*Frye* issue on its merits, both for reasons of precedent and considerations of fairness.

■ Yet it does not follow, as the Attorney General claims, that the record is inadequate to support a decision on the general admissibility of hypnotically aided testimony. Here the issue was fully raised by defendant. Not only did he make a timely pretrial motion on this ground, but on cross-examination of Catherine he probed critically into the purpose, method, and results of her hypnotic experience. By the testimony of Dr. Schafer, defendant then exposed the multiple risks in using hypnosis to restore a witness' memory; and he elicited from Dr. Schafer an unequivocal expert opinion that hypnosis is not reliable as a truth-seeking technique.

To be sure, in *Kelly* we doubted whether the testimony of a single witness, even if qualified, is sufficient to establish the views of an entire scientific community as to the reliability of a new procedure. (17 Cal.3d at p. 37.) As will appear, however, Dr. Schafer's testimony is supported by a substantial body of scholarly treatises and articles on the subject. The Attorney General complains that "literature is not evidence," and that it would be improper for this court to "pick and choose among that literature to decide issues of scientific fact." The remark betrays a fundamental misunderstanding of the task before us: our duty is *not* to decide whether hypnotically induced recall of witnesses is reliable as a matter of "scientific fact," but simply whether it is generally accepted as reliable by the relevant scientific community. We recognized in *Kelly* (*ibid.*) that "Ideally, resolution of the general acceptance issue would require consideration of the views of a typical cross-section of the scientific community, including representatives, if there are such, of those who oppose or question the new technique." But considerations of judicial economy make it impractical to require those views to be presented personally by each scientist testifying in open court: as pointed out in *Mack* (292 N.W.2d at p. 766), such a procedure would be prohibitively expensive, and would be frustrated in any event by the difficulty of

weight, not the admissibility" of the testimony. As we have seen, the trial court expressly relied on that rule in denying defendant's motion to exclude the posthypnotic testimony of the complaining witness. Believing that only credibility was in issue, the court refused to allow the prosecution to open up the subject of hypnosis in its case-in-chief.

finding local experts qualified to testify on hypnosis as an investigative rather than a therapeutic tool.

Accordingly, for this limited purpose scientists have long been permitted to speak to the courts through their published writings in scholarly treatises and journals. (*Kelly*, at p. 35; *Huntingdon* v. *Crowley* (1966) *supra*, 64 Cal.2d 647, 656; *People* v. *Palmer* (1978) *supra*, 80 Cal.App.3d 239, 252-254; *People* v. *Law* (1974) 40 Cal.App.3d 69, 75 [114 Cal.Rptr. 708]; *United States* v. *Addison* (D.C. Cir. 1974) 498 F.2d 741, 744-745.) The courts view such writings as "evidence," not of the actual reliability of the new scientific technique, but of its acceptance *vel non* in the scientific community. Nor do the courts "pick and choose" among the writings for this purpose. On many topics—including hypnosis—the scientific literature is so vast that no court could possibly absorb it all. But there is no need to do so, because the burden is on the proponent of the new technique to show a scientific consensus supporting its use; if a fair overview of the literature discloses that scientists significant either in number or expertise publicly oppose that use of hypnosis as unreliable, the court may safely conclude there is no such consensus at the present time.

That is the case before us. On the topic of hypnotically aided recall we have reviewed numerous scientific treatises and articles in scholarly journals.[34] From this review it clearly appears that major voices in the scientific community oppose the use of hypnosis to restore the memory of potential witnesses, with or without procedural safeguards, on the ground of its intrinsic unreliability. This unreliability is due both to certain properties of human memory and to factors inherent in the nature of hypnosis. We begin with the former, which have been little mentioned in the cases.

[34]We have also reviewed, but given little weight to, law review articles on this topic by authors who are exclusively members of the legal profession. A number of such articles are cited in *State* v. *Mack* (1980) *supra*, 292 N.W.2d 764, 765, footnote 4, and are discussed and criticized in Diamond, *Inherent Problems in the Use of Pretrial Hypnosis on a Prospective Witness* (1980) 68 Cal.L.Rev. 313, 327-331 (hereinafter cited as Diamond, *Inherent Problems*). As Dr. Diamond concludes, the articles suffer generally from an underestimation of the scientific risks in using hypnosis to restore a witness' memory, and an overestimation of the ability of traditional legal devices (e.g., expert testimony, cross-examination) to avoid those risks. It appears as true of hypnosis as of voiceprint analysis that "This area may be one in which only another scientist, in regular communication with other colleagues in the field, is competent to express such an opinion [as to the view of the scientific community] . . . . In considering the position of the scientific community, a court is bound to let scientists speak for themselves." (*Kelly*, at pp. 39-40 of 17 Cal.3d.)

## C

The principal proponent of hypnotically aided recall is a police department psychologist, Martin Reiser, Ed.D.[35] According to his published writings, Dr. Reiser operates on the belief that human memory is like a videotape machine that (1) faithfully records, as if on film, every perception experienced by the witness, (2) permanently stores such recorded perceptions in the brain at a subconscious level, and (3) accurately "replays" them in their original form when the witness is placed under hypnosis and asked to remember them. (See, e.g., Reiser, Handbook of Investigative Hypnosis (1980), ch. 40; Reiser, *Hypnosis as a Tool in Criminal Investigation* [Nov. 1976] The Police Chief 36, 40; Reiser, *Hypnosis as an Aid in a Homicide Investigation* (1974) 17 Am.J. Clinical Hypnosis 84, 85.) With minor variations, this belief—or assumption—is apparently shared by police psychologists and "hypnotechnicians" at all levels of law enforcement, and serves as the theory on which such personnel base their practice of hypnotizing potential witnesses to improve their recall of crime-related events.

The professional literature, however, rejects this belief: the scientists who work in the field generally agree that, as Dr. Schafer testified at trial, the memory does *not* act like a videotape recorder, but rather is subject to numerous influences that continuously alter its content. This view has been expressed at least since the pioneer study of Sir Frederic C. Bartlett of Cambridge University, published a half-century ago. (Bartlett, Remembering (1932, reprinted 1964).) Using a different simile in that pretelevision era, Bartlett critically examined the conventional belief of his time that "traces" of every event were laid down in the mind and permanently stored until they were "re-excited" by a stimulus and reappeared as memories. Bartlett began his analysis by pointing out that "there are obvious difficulties. The traces are generally supposed to be of individual and specific events. Hence, every normal individual must carry about with him an incalculable number of individual traces. Since these are all stored in a single organism, they are in fact bound to be related one to another, and this gives to recall its inevitably associative character" (*id.* at p. 203).

---

[35]Dr. Reiser is the director of behavioral science services of the Los Angeles Police Department. He is also the director of the Law Enforcement Hypnosis Institute, a proprietary school in Los Angeles that teaches courses in hypnotism to police and other law enforcement personnel.

Less obvious but even more important was Bartlett's now-famous conclusion, drawn from his experimental work, that memory is productive rather than reproductive: "The first notion to get rid of is that memory is primarily or literally reduplicative, or reproductive.... In fact, if we consider evidence rather than presupposition, remembering appears to be far more decisively an affair of construction rather than one of mere reproduction." (*Id.* at pp. 204-205.) As had often been shown, "condensation, elaboration and invention are common features of ordinary remembering" (*id.* at p. 205). Expanding on the latter point, Bartlett reported that "our studies have shown us that all manner of changes in detail constantly occur in instances which every normal person would admit to be genuine instances of remembering. There are changes in order of sequence, changes of direction, of complexity of structure, of significance, ..." (*Id.* at p. 312.) In summary, "Remembering is not the re-excitation of innumerable fixed, lifeless and fragmentary traces. It is an imaginative reconstruction, or construction, built out of the relation of our attitude towards a whole active mass of organized past reactions or experience ...." (*Id.* at p. 213.)

Bartlett's insight that "the past is being continually re-made, reconstructed in the interests of the present" (*id.* at p. 309) prevailed in due course among his colleagues, and is now the generally accepted view of the profession. Of the many works that support this view, we shall discuss but two as examples. In his analysis of the "permanent memory" hypothesis, Professor Douglas L. Hintzman observes that "Before even considering the relevant data, we can see a number of reasons for thinking that true forgetting does occur. Throughout our adult lives brain cells die and are not replaced. Even those that survive undergo continual change. There is a constant 'turnover' of the chemicals that make them up, just as there is in other parts of the body. And as we deal with our changing environment, it seems likely that we encode many new experiences by modifying trace structures originally developed to deal with old ones." (Hintzman, The Psychology of Learning and Memory (1978) p. 298.) He then examines the two phenomena most often cited as "evidence" for the permanent memory hypothesis.

The first is the work of Wilder Penfield, a neurosurgeon who has performed numerous brain operations on patients with advanced cases of epilepsy. In the course of those operations Penfield discovered that when he stimulated various locations in the brain with an electric probe, the patients—who were conscious during the procedure—reported experiencing vivid and detailed "flashbacks" reminding them of events

that assertedly occurred in their childhood. To explain these reports, Penfield proposed a model of memory very similar to the "videotape recorder" theory espoused by the police psychologists.[36] Professor Hintzman points out several serious objections to Penfield's conclusions. First, on some occasions the patients report that they experience not a "memory" but a dream or a hallucination, or simply a feeling of *deja vu*. (*Id.* at p. 301.) It is difficult if not impossible to distinguish between these phenomena. Next, "There is never any independent verification of the reported 'memories'—nothing to indicate the experience is really an event from the patient's past. There is only the subject's statement that it seems familiar, and therefore must be something that happened at an earlier time." (*Id.* at pp. 301-302.) As we shall see, this lack of independent verification infects most of the claimed "evidence" of reliable hypnotic recall. Finally, "such reports have not been obtained from non-epileptic patients" (*id.* at p. 302), and hence form a scientifically inadequate basis for drawing conclusions about the memory processes of the large majority of the population.

The second phenomenon often cited as evidence for permanent memory is "hypnotic age regression." This is the procedure by which, under hypnotic suggestion, a subject appears to regress in mental age until an earlier date in his life, then seems to "relive" the events he experienced on that date and their accompanying emotions. Again Professor Hintzman finds little persuasive value in such demonstrations, stressing that the subject's claim to recall specific individuals or events from his childhood is rarely if ever corroborated because of obvious difficulties in doing so. He also notes studies in which hypnotized subjects have instead undergone age "progression"—i.e., have been made to believe they are living 10 or more years *in the future*—and have reported their future "memories" with equal conviction and verisimilitude. "Good hypnotic subjects," the author explains, "will go to great lengths to comply with the hypnotist's requests, and this apparently includes constructing realistic scenarios and acting them out." (*Id.* at p. 303.) Professor Hintzman concludes that while the permanent memory hypothesis is

---

[36] Dr. Reiser, for example, accepts Penfield's evidence at face value, and relates without question the latter's somewhat extravagant conclusion that "the brain functions much like a high fidelity recorder, putting on tape, as it were, *every experience from the time of birth, possibly even before birth*, and that these experiences and associated feelings are available for replay today in as vivid a form as when they first occurred." (Italics added; fn. deleted.) (Reiser, Handbook of Investigative Hypnosis (1980) p. 8.)

tantalizing in its simplicity, the evidence offered in its support is weak and the hypothesis is probably incorrect. (*Id.* at p. 304.)[37]

Elizabeth F. Loftus, Ph.D., a highly experienced investigator in the field of memory, reaches similar conclusions in a number of her articles (e.g., Loftus & Loftus, *On the Permanence of Stored Information in the Human Brain* (1980) 35 Am. Psychologist 409) and in her valuable treatise, Eyewitness Testimony (1979). Adopting a different simile, she explains in the latter that "During the time between an event and a witness' recollection of that event—a period often called the 'retention interval'—the bits and pieces of information that were acquired through perception do not passively reside in memory waiting to be pulled out like fish from water. Rather, they are subject to numerous influences. External information provided from the outside can intrude into the witness' memory, as can his own thoughts, and both can cause dramatic changes in his recollection." (*Id.* at pp. 86-87.) Her reasons for this view deserve close attention. On the basis of her research Dr. Loftus identifies a number of the influences that can cause a memory to change during the retention interval without the witness' awareness: the witness may "compromise" the memory with a subsequently learned but inconsistent fact (*id.* at p. 56); he may "incorporate" into the memory a nonexistent object or event casually mentioned by a third party, e.g., in later questioning (*id.* at p. 60); postevent information may change the way the witness "feels" about the original incident, e.g., may affect his impression of how noisy or how violent it was (*id.* at pp. 70-72); because a witness is under great social pressure to be complete and accurate he may fill gaps in his memory by guessing, and thereafter "recall" those guesses as part of the memory;[38] and if the witness is subjected to repeated questioning, any erroneous statement he made early on may be "frozen into" the memory and reappear later as a fact (*id.* at pp. 84-86). There is no way to tell, moreover, whether any given detail recalled by the witness comes from his original perception or from external information that he subsequently acquired. (*Id.* at p. 78.)

---

[37] A leading scientific study is in accord. (O'Connell et al., *Hypnotic Age Regression: An Empirical and Methodological Analysis* (Dec. 1970) 76 J.Abnorm.Psych. (monograph supp. pt. 2).)

[38] In language particularly relevant to the risks of hypnotically inducing recall through the "videotape recording" technique, Dr. Loftus adds: "while an initial guess may be offered with low confidence, later, when the witness mistakes the guess for a real memory, the confidence level can rise. This seems to occur because a witness is now 'seeing' an item that he himself has constructed in memory." (*Id.* at p. 82.)

From these studies Dr. Loftus has no doubt that postevent experiences can alter any witness' memory, subtly but irreversibly. The author then considers and rejects the permanent memory hypothesis. Observing that "People cling to highly suspicious evidence to support this belief" (*id.* at p. 115), she is particularly critical of the "evidence" allegedly provided by hypnotic age regression: "many investigators believe that hypnosis is unreliable and unpredictable, and is just as likely to create new memories as to recover old ones." (*Ibid.*) And because such accounts are ordinarily unverifiable, "Vivid memories may be produced, but who can say whether these have or have not been altered by subsequent experiences to which a person has been exposed." (*Ibid.*) Dr. Loftus concedes it will never be possible to "prove" conclusively that a witness does *not* have an unaltered memory trace of a given event, for it can always be objected that the technique for unearthing it was inadequate—i.e., that "we did not dig deep enough." (*Id.* at p. 117.) Nevertheless, after careful investigation the author reports that "My colleagues and I have used a number of different techniques to try to induce such witnesses to reveal evidence of any traces of the original information. In all of these cases, we have been unable to provide *any* evidence that an intact original memory remains." (Italics added; *id.* at p. 118.)

The "videotape recorder" theory of law enforcement hypnotists also lacks empirical support for the third of its assumptions, to wit, that upon being unlocked by hypnosis the witness' repressed memories are "replayed" without further modification as he recalls the original event.[39] Once more the research results are otherwise: in this final stage of the process, known as "retrieval," the accuracy of the witness' memory may be adversely affected by outside factors even as he recalls it. Again Dr. Loftus identifies some of those influences as follows: the witness may subconsciously tailor his recall to conform to expectations implied by the person questioning him; those expectations may be conveyed, intentionally or not, either by such conduct of the questioner as tone of voice, emphasis, pauses, facial expression and other "body language" (*id.* at pp. 72-74), or by the particular method of interview

---

[39]The theory also lacks support for its initial assumption, i.e., that the witness is capable in the first instance of "recording" his every perception of the original event with complete fidelity. Extensive work by memory investigators (including Dr. Loftus) demonstrates that in this stage of the process, known as "acquisition" or "encoding," the witness is likewise subject to external and internal influences that tend to distort his perceptions at the very moment he experiences them. For present purposes, however, we need not discuss this phenomenon further: it occurs potentially in every witness, and has no immediate counterpart in the procedure of hypnotically aided recall.

used[40] or precise form of question asked[41] (*id.* at pp. 90-94); and the witness may be more likely to respond to such cues if the questioner is a status figure (e.g., a doctor or a law enforcement official) than if he is merely a passerby inquiring what happened (*id.* at pp. 97-98).

Lastly, Dr. Loftus warns there is no clear correlation between the witness' confidence in the accuracy of his recall and its accuracy in fact: indeed, studies have shown that in some circumstances "people can be more confident about their wrong answers than their right ones. To be cautious, one should not take high confidence as any absolute guarantee of anything." (*Id.* at p. 101.) The final distorting influence on memory retrieval, then, is a well-documented phenomenon: "Most people, including eyewitnesses, are motivated by a desire to be correct, to be observant, and to avoid looking foolish. People want to give an answer, to be helpful, and many will do this at the risk of being incorrect. People want to see crime solved and justice done, and this desire may motivate them to volunteer more than is warranted by their meager memory. The line between valid retrieval and unconscious fabrication is easily crossed." (*Id.* at p. 109.)[42]

## D

We have dwelt on the reports of current research into the operation of human memory for two reasons. First, as we have seen, that research convincingly undermines the "videotape recorder" theory on which most law enforcement hypnosis of potential witnesses is premised.[43] Second,

---

[40]The interrogatory method ("Did you see a gun?") produces recollections of lower accuracy but greater detail than the narrative method ("Tell me what you saw.").

[41]The classic distinction is between asking the witness, "Did you see a gun?" and asking him, "Did you see the gun?" Other semantic differences with significant effects on accuracy have been reported in the literature. (See, e.g., Hilgard & Loftus, *Effective Interrogation of the Eyewitness* (1979) 27 Internat. J. Clinical & Experimental Hypnosis 342, 346-351.)

[42]Such motivation may be all the more powerful, of course, when the witness to the crime is also its victim. In that event the natural desire to see "justice done" may be fueled by a deeper yearning for vengeance.

[43]On the basis of that research, for example, Dr. Orne flatly rejects the "videotape" model: "Suffice it to say that such a view is counter to any currently accepted theory of memory and is not supported by scientific data [citations]." (Orne, *The Use and Misuse of Hypnosis in Court* (1979) 27 Internat. J. Clinical & Experimental Hypnosis 311, 321 [hereinafter cited as Orne, *Use and Misuse*].) While he concedes that in working with the hypnotic subject the "videotape" imagery may at times be useful, he explains that "no competent hypnotherapist would, in using such a metaphor, confuse it with the manner in which memory is organized." (*Id.* at p. 325, fn. 7.)

each of the phenomena found by such research to contribute to the unreliability of normal memory reappears in a more extreme form when the witness is hypnotized for the purpose of improving his recollection.[44]

We turn, then, to the professional literature on the latter topic. For present purposes we need not add to this already lengthy discussion by analyzing that literature in detail; it will be enough if we simply set forth its principal relevant conclusions, with citations to a representative sample of supporting studies. The conclusions will necessarily be oversimplified, but full explanations of each point can be found in the cited authorities and similar works.[45]

1. Hypnosis is by its nature a process of suggestion, and one of its primary effects is that the person hypnotized becomes extremely receptive to suggestions that he perceives as emanating from the hypnotist. The effect is intensified by another characteristic of the hypnotic state, to wit, that the attention of the subject is wholly focused on and direct-

---

[44]For this reason we cannot subscribe to the theory of *Hurd* (432 A.2d at p. 92) that however untrustworthy hypnotically induced recall may be, it is at least no worse than ordinary memory if it is accompanied by six listed "safeguards." We explain above (pt. II C, *ante*) why we find such "safeguards" both inadequate and impractical.

[45]As will appear, the most persuasive spokesmen for the relevant scientific community are Drs. Diamond and Orne. Dr. Diamond, who is both clinical professor of psychiatry and professor of law at the University of California, is well known to the legal profession. He is the author of numerous articles in the area of psychiatry and the law, and we have often relied on his views. (See, e.g., *People* v. *Burnick* (1975) 14 Cal.3d 306, 327, 328 & fn. 19 [121 Cal.Rptr. 488, 535 P.2d 352], where we describe Dr. Diamond as "a nationally known specialist in this field.")

Martin T. Orne, M.D., Ph.D., is equally well known and respected by that segment of the medical profession specializing in the theory and practice of hypnosis. He is at once an investigator, a clinician, and an educator: director of the Unit for Experimental Psychiatry at The Institute of Pennsylvania Hospital, one of the nation's most active laboratories of hypnosis research, he is also senior attending psychiatrist at the same hospital and Professor of Psychiatry at the University of Pennsylvania. In addition, Dr. Orne is the president of the International Society of Hypnosis, the editor of the International Journal of Clinical and Experimental Hypnosis, the senior author of the article on hypnosis in the Encyclopaedia Britannica (see fn. 15, *ante*), and the author of leading articles on hypnosis research in the scholarly journals. He has often testified as an expert on hypnosis, and his eminence in the field has repeatedly been recognized in the published opinions. (See, e.g., *State* v. *Mack* (1980) *supra*, 292 N.W.2d 764, 766; *State* v. *Hurd* (1980) 173 N.J.Super. 333 [414 A.2d 291, 296]; *People* v. *Hughes* (N.Y. County Ct. 1979) 99 Misc.2d 863 [417 N.Y.S.2d 643, 646].)

By relying primarily on Drs. Diamond and Orne, of course, we do not mean to denigrate the contributions of many other experts in hypnosis whose writings we have also consulted (e.g., Ernest R. Hilgard, Ph.D., director of the Stanford University laboratory of hypnosis research), some of whom we cite hereinafter. On the present issue, however, the majority are in full agreement with the essential findings and conclusions of Drs. Diamond and Orne.

ed by the hypnotist. The suggestions may take the form of explicit requests or predictions by the hypnotist; or they may be inferred by the subject from information he acquired prior to or during the hypnotic session, or from such cues as the known purpose of that session, the form of questions asked or comments made by the hypnotist, or the hypnotist's demeanor and other nonverbal conduct. The suggestions can be entirely unintended—indeed, unperceived—by the hypnotist himself.[46]

2. The person under hypnosis experiences a compelling desire to please the hypnotist by reacting positively to these suggestions, and hence to produce the particular responses he believes are expected of him. Because of this compulsion, when asked to recall an event either while in "age regression" or under direct suggestion of heightened memory ("hypermnesia"), he is unwilling to admit that he cannot do so or that his recollection is uncertain or incomplete. Instead, he will produce a "memory" of the event that may be compounded of (1) relevant actual facts, (2) irrelevant actual facts taken from an unrelated prior experience of the subject, (3) fantasized material ("confabulations") unconsciously invented to fill gaps in the story, and (4) conscious lies—all formulated in as realistic a fashion as he can.[47] The likelihood of such self-deception is increased by another effect of hypnosis, i.e., that it significantly impairs the subject's critical judgment and causes him to give credence to memories so vague and fragmentary that he would not have relied on them before being hypnotized.[48]

---

[46]Diamond, *Inherent Problems*, page 333; Orne, *Use and Misuse*, pages 322-327; Orne, *On the Simulating Subject as a Quasi-Control Group in Hypnosis Research: What, Why, and How, in Hypnosis: Research Developments and Perspectives* (Fromm & Schor edits. 1972) pages 400-403 [hereinafter cited as *Hypnosis Research*]; Orne, *The Nature of Hypnosis: Artifact and Essence* (1959) 58 J.Abnorm. & Soc.Psych. 277, 280-286, 297; see generally Hilgard, Hypnotic Susceptibility (1965); Weitzenhoffer, Hypnotism: An Objective Study in Suggestibility (1953); Hull, Hypnosis and Suggestibility (1933).

[47]In a recent California case, for example, the complaining witness underwent no less than four pretrial hypnotic sessions for the purpose of improving her memory of the crime. The sessions were conducted by a physician experienced in the use of hypnosis, and he was convinced that the witness was in fact hypnotized on each occasion. He was of the opinion, however, that the entire recollection produced by the witness while in the trance state was a deliberate lie. He explained that a hypnotized person "is able to lie, and will lie for the same reasons he would lie in a nonhypnotic condition." (*People v. Lopez* (1980) 110 Cal.App.3d 1010, 1017 [168 Cal.Rptr. 378].) The Court of Appeal accepted this explanation, and concluded that "the hypnotic sessions were not instrumental in refreshing the victim's memory. On the contrary, throughout those sessions she continued to repeat a fabricated tale." (*Id.* at p. 1018.)

[48]Diamond, *Inherent Problems*, pages 335, 337-338; Orne, *Use and Misuse*, pages 316-320; Putnam, *Hypnosis and Distortions in Eyewitness Testimony* (1979) 27 Inter-

3. During the hypnotic session, neither the subject nor the hypnotist can distinguish between true memories and pseudomemories of various kinds in the reported recall; and when the subject repeats that recall in the waking state (e.g., in a trial), neither an expert witness nor a lay observer (e.g., the judge or jury) can make a similar distinction. In each instance, if the claimed memory is not or cannot be verified by wholly independent means, no one can reliably tell whether it is an accurate recollection or mere confabulation. Because of the foregoing pressures on the subject to present the hypnotist with a logically complete and satisfying memory of the prior event, neither the detail, coherence, nor plausibility of the resulting recall is any guarantee of its veracity.[49]

4. Nor is such guarantee furnished by the confidence with which the memory is initially reported or subsequently related: a witness who is uncertain of his recollections before being hypnotized will become convinced by that process that the story he told under hypnosis is true and correct in every respect. This effect is enhanced by two techniques commonly used by lay hypnotists: before being hypnotized the subject is told (or believes) that hypnosis will help him to "remember very clearly everything that happened" in the prior event, and/or during the trance he is given the sugggestion that after he awakes he will "be able to remember" that event equally clearly and comprehensively.[50] Further enhancement of this effect often occurs when, after he returns to the waking state, the subject remembers the content of his new "memory" but forgets its source, i.e., forgets that he acquired it during the hypnotic session ("posthypnotic source amnesia"); this phenomenon can arise spontaneously from the subject's expectations as to the nature and effects of hypnosis, or can be unwittingly suggested by the hypnotist's instructions. Finally, the effect not only persists, but the witness' convic-

---

nat. J. Clinical & Experimental Hypnosis 437, 446; Gibson, Hypnosis: Its Nature and Therapeutic Uses (1977) pages 58-59; Shor, *The Fundamental Problem in Hypnosis Research as Viewed From Historic Perspectives*, in *Hypnosis Research*, pages 37-39; Hilgard, Hypnotic Susceptibility (1965) page 9; Hull, Hypnosis and Suggestibility (1933) pages 111-115.

[49]Diamond, *Inherent Problems*, pages 333-335, 337-338, 340; Orne, *Use and Misuse*, pages 317-318, 320; Spiegel, *Hypnosis and Evidence: Help or Hindrance?* (1980) 347 Annals N.Y. Acad. Sci. 73, 79; Kroger & Douce, *Hypnosis in Criminal Investigation* (1979) 27 Internat. J. Clinical & Experimental Hypnosis 358, 365-367.

[50]Such suggestions are recommended by police hypnosis manuals (e.g., Reiser, Handbook of Investigative Hypnosis (1980) ch. 40), and were given in several of the cases discussed herein (e.g., *Harding, Mack,* and *Mena*).

tion of the absolute truth of his hypnotically induced recollection grows stronger each time he is asked to repeat the story; by the time of trial, the resulting "memory" may be so fixed in his mind that traditional legal techniques such as cross-examination may be largely ineffective to expose its unreliability.[51]

## IV

The professional literature thus fully supports the testimony of Dr. Schafer and the similar findings of the courts in *Mack, Mena*, and *Nazarovitch*. It also demonstrates beyond any doubt that at the present time the use of hypnosis to restore the memory of a potential witness is *not* generally accepted as reliable by the relevant scientific community. Indeed, representative groups within that community are on record as expressly opposing this technique for many of the foregoing reasons, particularly when it is employed by law enforcement hypnotists.[52] In these circumstances it is obvious that the *Frye* test of admissibility has not been satisfied. We therefore hold, in accord with the decisions discussed above (pt. II C, *ante*), that the testimony of a witness who has undergone hypnosis for the purpose of restoring his memory of the events in issue is inadmissible as to all matters relating to those events,

---

[51]Diamond, *Inherent Problems*, pages 339-340; Orne, *Use and Misuse*, pages 320, 327, 332; Cooper, *Hypnotic Amnesia*, in *Hypnosis Research*, pages 223-231; Cooper, *Spontaneous and Suggested Posthypnotic Source Amnesia* (1966) 14 Internat. J. Clinical & Experimental Hypnosis 180; Evans & Thorn, *Two Types of Posthypnotic Amnesia: Recall Amnesia and Source Amnesia* (1966) 14 Internat. J. Clinical & Experimental Hypnosis 162; Hilgard, Hypnotic Susceptibility (1965) pages 166, 182.

[52]Thus in October 1978 the Society for Clinical and Experimental Hypnosis adopted a resolution reading in part:

"The Society for Clinical and Experimental Hypnosis views with alarm the tendency for police officers with minimal training in hypnosis and without a broad professional background in the healing arts employing hypnosis to presumably facilitate recall of witnesses or victims privy to the occurrence of some crime. Because we recognize that hypnotically aided recall may produce either accurate memories or at times may facilitate the creation of pseudo memories, or fantasies that are accepted as real by subject and hypnotist alike, we are deeply troubled by the utilization of this technique among the police. It must be emphasized that there is no known way of distinguishing with certainty between actual recall and pseudo memories except by independent verification.

"Police officers typically have had limited technical training and lack the broad understanding of psychology and psychopathology. Their orientation is to obtain the information needed to solve a crime rather than a concern focusing on protecting the

from the time of the hypnotic session forward. ██ ██ ██ ██ It follows that the trial court erred in denying defendant's motion to exclude Catherine's testimony.[53]

██ We briefly discuss certain limitations on the rule. First, a previously hypnotized witness is not incompetent in the strict sense of being unable to express himself comprehensibly or understand his duty to tell the truth (Evid. Code, § 701), or of lacking the general capacity both to perceive and remember (Jefferson, Cal. Evidence Benchbook (1972) § 26.2, p. 351). Accordingly, if the prosecution should wish to question such a witness on a topic *wholly unrelated* to the events that were the subject of the hypnotic session, his testimony as to that topic would not be rendered inadmissible by the present rule.

Second, when it is the defendant himself—not merely a defense witness—who submits to pretrial hypnosis, the experience will not render his testimony inadmissible if he elects to take the stand. In that case, the rule we adopt herein is subject to a necessary exception to avoid impairing the fundamental right of an accused to testify in his own behalf. (*People v. Robles* (1970) 2 Cal.3d 205, 214-215 [85 Cal.Rptr. 166, 466 P.2d 710].)

Third, like the court in *Mack* (fn. 28, *ante*) we do not undertake to foreclose the continued use of hypnosis by the police for purely investigative purposes. We recognize that on occasions in the past a subject has apparently been helped by hypnosis to remember a verifiable fact —such as a license plate number—that the police previously did not know and were then able to use as a "lead" for further investigation of the crime. It is neither appropriate nor necessary for us to enter the de-

---

health of the subject who was either witness to, or victim of, a crime. Finally, police officers understandably have strong views as to who is likely to be guilty of a crime and may easily inadvertently bias the hypnotized subject's memories even without themselves being aware of their actions." (27 Internat. J. Clinical & Experimental Hypnosis (1979) 452.)

In August 1979 an identical resolution was adopted by the International Society of Hypnosis. (*Id.* at p. 453.)

[53]The principles stated in this opinion will govern the admissibility of the testimony of any witness who submits to pretrial hypnosis after the date of this decision. We take no position at this time as to the application of those principles to witnesses hypnotized before the date of this decision.

bate as to the need for this investigative technique,[54] or its reliability.[55] We reiterate, however, that for the reasons stated above any person who has been hypnotized for investigative purposes will not be allowed to testify as a witness to the events that were the subject of the hypnotic session. Evidence discovered by such an investigation, of course, is not ipso facto rendered inadmissible by the prior hypnosis.

Fourth, error in admitting the testimony of a previously hypnotized witness is not reversible per se; its effect must still be judged under the prejudicial error test adopted in *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243]. (See *People v. Kelly, supra,* at p. 40 of 17 Cal.3d.) The test is to be applied, however, in light of the reasons for our holding herein.

■ Arguing that the error was harmless, the Attorney General assumes that the inadmissible evidence in this record is limited to those few portions of Catherine's testimony that she asserted were directly affected by her hypnotic experience. (See pt. I B, *ante.*) Yet as we have seen, it is the consensus of informed scientific opinion today that in no case can a person previously hypnotized to improve his recollection reliably determine whether any unverified item of his testimony originates

---

[54]Dr. Diamond, for example, believes that "the value of hypnosis for investigative purposes has been greatly overstated by exaggerated claims in irresponsible books and articles. As Freud discovered long ago, whatever can be done by hypnosis can also be done without hypnosis; it merely takes longer and requires greater skill and patience. My own experience convinces me that safe and effective enhancement of recall, with less hazard of suggestion and contamination of future testimony, can be accomplished without gimmicks such as hypnosis and 'truth serum.'" (Diamond, *Inherent Problems,* p. 332, fn. 93.)

[55]Experience has shown that even such an apparently objective fact as a license plate number can as easily be confabulated as accurately remembered. (Orne, *Use and Misuse,* p. 318; Putnam, *op. cit. supra* fn. 48, at pp. 444-445.) For this reason, even proponents of the practice warn against relying without verification on any "fact" recalled by the subject as a result of hypnosis: "The most one can legitimately expect from hypnotic interrogation is further data, which may serve as *leads* for more conventional evidence gathering. Data elicited through hypnosis by itself deserve low or no priority until they are supported by other data." (Spiegel, *op. cit. supra* fn. 49, at p. 79.) And Kroger and Douce likewise conclude that "hypnotically related evidence must be validated through careful independent investigation or it is useless! In short, hypnosis is not a modality designed to determine truth from deception." (Kroger & Douce, *op. cit. supra* fn. 49, at p. 371; accord, Schafer & Rubio, *Hypnosis to Aid the Recall of Witnesses* (1978) 26 Internat. J. Clinical & Experimental Hypnosis 81, 83.)

in his own memory or is instead a confusion or confabulation induced by the hypnotic experience. It would fly in the face of that consensus to allow a witness to be the judge of which portions of his testimony were actually produced by hypnosis.

The Attorney General suggests that we can at least determine which of Catherine's recollections were potentially the product of hypnosis, by the device of comparing her testimony at trial with the prehypnotic versions of her story given in her interview at the police station and her testimony at the preliminary hearing. But Dr. Schafer's testimony and the professional literature agree that the effects of pretrial hypnosis to restore a witness' recollection go beyond the bare production of pseudo-memories during the trance: the experience will tend to clothe the witness' entire testimony in an artificial but impenetrable aura of certainty,[56] and may distort the witness' recall of related events occurring both before and after the hypnotic session.[57] Moreover, it would be impossible in most cases for an appellate court to undertake the kind of comparative analysis proposed by the Attorney General, because such materials as station-house interviews by the police or preliminary hearing testimony are not ordinarily part of the record.[58]

---

[56]There is evidence that some law enforcement agencies hypnotize appropriate prospective witnesses not to fill gaps in their memory but merely to bolster their credibility and make them "unshakeable" on the stand. (See, e.g., Orne, *Use and Misuse*, p. 332; *State* v. *Mack* (1980) *supra*, 292 N.W.2d 764, 769 & fn. 10 [reporting testimony by Dr. Orne to the same effect].)

[57]For example, Dr. Diamond reports that "the police may tell a witness something just before hypnosis and then hypnotize him. When he awakes, his 'source amnesia' may lead him to believe that the police statement was a product of his own memory. Sometimes communications made to the patient after hypnosis may be retroactively integrated into the hypnotic recall. The subject may recall a fact with no awareness that it was not the product of his own mind. Or he may recall being told the fact but insist that he had prior knowledge of it. This often happens when subjects are shown photographs or line-ups for identification just before or just after hypnotic sessions." (Diamond, *Inherent Problems*, at p. 336.) The author observes that these distortions of memory tend to be strengthened by the passage of time, and concludes that pretrial hypnosis of a witness "appreciably influences *all of his subsequent testimony* in ways that are outside the consciousness of the witness and difficult, if not impossible, to detect." (Italics added; *ibid.*)

[58]Indeed, in the case at bar the Attorney General successfully opposed a motion by defendant to augment the record in the Court of Appeal to include the preliminary hearing transcript. Although we ultimately lodged that transcript in this court over the Attorney General's opposition, he successfully objected to our lodging in addition a transcript of Catherine's interview at the police station.

We conclude that proper application of the *Watson* prejudicial error test in the present context requires the appellate court to determine whether it is reasonably probable that a result more favorable to the defendant would have occurred if the testimony of the previously hypnotized witness as to all matters relating to the events of the crime had not been admitted. This was the analysis we followed in *Kelly*. Applying the same analysis to the record before us, we find the error in admitting Catherine's testimony at trial to be prejudicial as it constituted virtually the sole incriminating evidence against defendant. To prevent a miscarriage of justice, a conviction predicated on such tainted evidence cannot be allowed to stand. (Cal. Const., art. VI, § 13.)

V

█ Of defendant's remaining contentions, we need address only one that bears on the question of retrial. At the close of the prosecution's case-in-chief, defendant unsuccessfully moved for a judgment of acquittal on the ground of insufficiency of the evidence. (Pen. Code, § 1118.1.) He now contends the trial court erred in denying that motion, arguing that Catherine was incompetent as a witness because her intoxication had impaired her ability to perceive and remember the events of the evening, and that her testimony was so inconsistent as to be unbelievable. The effect of her intoxication, however, was for the jury to determine; on this record it falls far short of incompetence as a matter of law. And although her testimony was vague and self-contradictory on a number of points, when taken as a whole it was not inherently incredible and would have constituted at least "substantial evidence" to support a verdict of guilt. (See *People v. Blair* (1979) *supra*, 25 Cal.3d 640, 666; *People v. Pierce* (1979) 24 Cal.3d 199, 210 [155 Cal.Rptr. 657, 595 P.2d 91].)

It is true that we now hold Catherine's testimony legally inadmissible because of her pretrial hypnotic experience. But in the circumstances of this case the holding does not justify a judgment of acquittal. The purpose of a motion under section 1118.1 is to weed out as soon as possible those few instances in which the prosecution fails to make even a prima facie case. (*People v. Belton* (1979) 23 Cal.3d 516, 520-521 [153 Cal.Rptr. 195, 591 P.2d 485].) It therefore speaks to "the evidence then before the court" (§ 1118.1), i.e., to the evidence that the trial court has

properly admitted as of the time the motion is determined. As noted above (fn. 33, *ante*), none of the hypnosis cases we now follow had been decided as of the time of the motion herein, and hence the trial court applied the then-prevailing general rule that the fact of Catherine's pretrial hypnotic experience went to "the weight, not the admissibility" of her testimony.

■ For the same reason, retrial is not prohibited by the federal double jeopardy clause under the rule of *Burks* v. *United States* (1978) 437 U.S. 1 [57 L.Ed.2d 1, 98 S.Ct. 2141], and *Greene* v. *Massey* (1978) 437 U.S. 19 [57 L.Ed.2d 15, 98 S.Ct. 2151], followed in this state (*People* v. *Pierce, supra*, 24 Cal.3d at pp. 209-210). That rule forbids retrial after a reversal ordered because the evidence introduced at trial was insufficient to support the verdict. (See, e.g., *In re Johnny G.* (1979) 25 Cal.3d 543, 548-549 [159 Cal.Rptr. 180, 601 P.2d 196].) It is inapplicable, however, to the situation here presented. The rule achieves its aim—i.e., of protecting the defendant against the harassment and risks of unnecessary repeated trials on the same charge—by the device of giving the prosecution a powerful incentive to make the best case it can at its first opportunity. (*Burks*, at p. 11 [57 L.Ed.2d at pp. 9-10].) But the incentive serves no purpose when, as here, the prosecution did make such a case under the law as it then stood; having done so, the prosecution had little or no reason to produce other evidence of guilt. To be sure, we now hold it error to admit Catherine's testimony against defendant; but "reversal for trial error, as distinguished from evidentiary insufficiency, does not constitute a decision to the effect that the government has failed to prove its case." (*Id.* at p. 15 [57 L.Ed.2d at p. 12].) Rather, the matter is governed by the settled rule that the double jeopardy clause does not prohibit retrial after a reversal premised on error of law. (*Ibid.*; accord, *United States* v. *Tateo* (1964) 377 U.S. 463, 465 [12 L.Ed.2d 448, 450, 84 S.Ct. 1587], and cases cited.)[59]

It follows that there is no legal bar to retrying defendant on these charges. Of course, for the reasons stated above Catherine cannot be allowed to testify in such a trial on any of the events that were the subject of her hypnotic experience; her prehypnotic testimony at the prelimi-

---

[59]We do not decide whether the same result would follow in a case in which the evidence held inadmissible on appeal had also been inadmissible at the time of trial. The United States Supreme Court expressly left this question open in *Greene*. (437 U.S. at p. 26, fn. 9 [57 L.Ed.2d at p. 22].)

nary hearing, however, may be admissible in lieu thereof.[60] Whether a retrial is justified in the circumstances of this case is for the prosecutor to determine.

The judgment is reversed.

Bird, C. J., Newman, J., Broussard, J., and Tobriner, J.,* concurred.

**RICHARDSON, J.**—I concur in the judgment. Under the circumstances in this case, the prosecutrix' testimony was subject to objection because it was the product of a hypnotic session conducted by a deputy district attorney rather than by a trained professional who was wholly unaffiliated with law enforcement.

I am unable, however, to support an absolute rule rendering inadmissible *all* hypnotically induced testimony without regard to the safeguards under which the hypnosis occurred. Consistent with recent authority and critical commentary, such testimony should be admissible if elicited under adequate safeguards including requiring that (1) the hypnosis is conducted by a trained, independent psychiatrist or psychologist who in writing is supplied with only sufficient factual background necessary to conduct the session; (2) the hypnosis is videotaped or otherwise recorded for purposes of subsequent review; (3) no persons other than the hypnotist and his subject are present; and (4) the hypnotist obtains a written description of the subject's prior description of the event for comparison purposes. (See *State* v. *Hurd* (1981) 86 N.J. 525 [432 A.2d 86, 96-97]; Note, *The Admissibility of Testimony Influenced by Hypnosis* (1981) 67 Va.L.Rev. 1203, 1230-1232.) If the procedures

---

[60]Because Catherine is now "Disqualified from testifying to the matter" (Evid. Code, § 240, subd. (a)(2)) she is "unavailable as a witness" within the meaning of the former-testimony exception to the hearsay rule (*id.*, § 1291, subd. (a)), and her preliminary hearing testimony was given in a proceeding in which defendant had the "right and opportunity" to cross-examine her with the same "interest and motive" that he now has (*id.*, subd. (a)(2)). Unless defendant can show that Catherine's disqualification as a witness "was brought about by the procurement or wrongdoing of the proponent of [her] statement for the purpose of preventing [her] from attending or testifying" (§ 240, subd. (b)), her preliminary hearing testimony is therefore admissible under the Evidence Code.

*Retired Associate Justice of the Supreme Court sitting under assignment by the Chairperson of the Judicial Council.

used are free of suggestion and, in the discretion of the trial court, the probative value of the testimony is not outweighed by its potential for prejudice, I would admit it.

As stated by the New Jersey Supreme Court in *Hurd,* "we believe that a rule of *per se* inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." (P. 94; accord, Note, *supra,* at p. 1233.) I share that belief.

KAUS, J.—I concur in the reversal of the judgment, but feel compelled to dissent from several conclusions of the majority unnecessary to decide this appeal.

On the record before us, this is a relatively simple case. At the outset of the trial, defense counsel objected that a portion of the testimony Catherine was about to give—concerning a period of time during which she had previously testified that she had been asleep—was the result of the improper use of hypnosis, that "it is not in fact refreshing a witness' recollection . . . but that it is . . . *manufactured evidence.*" (My italics.) The trial court overruled the objection on the basis that the hypnosis only went to the weight of Catherine's testimony.

That ruling was patently wrong, even if there may have been some out-of-state case law to support it. Section 702 of the Evidence Code demands that the testimony of any witness, except an expert, be based on personal knowledge and provides that "[a]gainst the objection of a party, such personal knowledge must be shown before the witness may testify concerning the matter." Defendant clearly objected that the witness was about to testify from other than personal knowledge—that she was about to give "manufactured evidence." This placed the burden of showing that the witness would testify from personal knowledge on the prosecutor, who did nothing except argue that *People v. Colligan* (1979) 91 Cal.App.3d 846 [154 Cal.Rptr. 389] "indicated that hypnosis did not as a matter of law render inadmissible the subsequent identification of a defendant by the witness." Obviously the citation of a case is not a showing that a particular witness is about to testify from personal

knowledge, and, in fact, the *Colligan* decision does not purport to relieve a prosecutor of the burden of demonstrating the personal knowledge of a previously hypnotized witness in response to a proper objection.[1]

Thus, on this state of the record, the trial court should not have admitted Catherine's challenged testimony. Given the ambiguities and inconsistencies of Catherine's additional testimony, and the substantial evidence presented by the defense, the error was clearly prejudicial and requires reversal of the judgment. This is all we need to decide in this case.

I recognize, of course, that we have about a dozen additional hypnosis cases pending before us, and that the majority has chosen to use this appeal as a vehicle for deciding the broader issues presented by some of the others. In my view, however, it is a mistake to adopt at this point the sweeping, "per se" rule that the majority proposes—excluding virtually all testimony of a witness who has undergone pretrial hypnosis—without more carefully considering the varied contexts in which hypnosis may take place and the many factors which may affect both the potential danger and the potential utility of hypnosis in a particular instance.

This is the first time we have been called upon to consider the admissibility of a witness' posthypnosis testimony, and it is by no means clear to me that the facts of this case are typical of hypnosis cases in general. There are obviously a number of factors that render Catherine's posthypnosis testimony particularly suspect. Because she was at least somewhat intoxicated at the time of the alleged offense, there is a good possibility that she has no clear memory to be refreshed by hypnosis, and instead that she has simply constructed or "confabulated" a "memory" while under hypnosis. (Cf., e.g., *Com.* v. *Nazarovitch* (1981) 496 Pa. 97 [436 A.2d 170, 177-178].) In addition, at the time she was hypnotized she had already given a number of somewhat different accounts of the evening in question, and the academic literature suggests

---

[1]In *Colligan*, a witness to a robbery was hypnotized shortly after the crime to help her recall the license plate of a car used in the robbery, and during the hypnosis the

that under such circumstances there is a particularly strong danger that hypnosis will simply serve to fix one particular version—not necessarily the historically accurate one—in the subject's mind and render the witness impervious to cross-examination. (See Orne, *The Use and Misuse of Hypnosis in Court* (1972) 27 Internat. J. Clinical & Experimental Hypnosis 311, 332-334.) Finally, of course, the hypnosis in this case was not performed by an impartial hypnotist in a setting calculated to minimize potential suggestiveness, but by a deputy district attorney in the presence of the investigating police officers. Given all these facts, I can agree with the majority that, if this case is retried, Catherine should not be permitted to testify.

I think, however, that we should be very wary about establishing a broad, generally applicable exclusionary rule for all posthypnosis testimony on the basis of the rather egregious facts of this case alone. In other instances, hypnosis may arise in a completely different setting, as, for example, when a victim or a witness to a crime is hypnotized shortly after the offense to aid a police artist compose a sketch of the suspect. In such a case, none of the participants to the hypnosis may have any preconceived bias which would pose a special danger of suggestiveness, and in some cases the witness' posthypnosis statements may not differ at all from his or her prehypnosis statements, or the suspect may be later caught with incriminating evidence corroborating the reliability of at least some of the witness' posthypnosis memory. If, in such a case, an adequate record of the hypnosis session exists and demonstrates the session's basic fairness, it is not clear to me that the mere fact that the victim or witness has at one time been hypnotized necessarily mandates the total exclusion of the potentially crucial testimony at a later trial.

---

witness also gave a description of the robber. At trial, the witness identified the defendant as the robber, apparently without objection, but on appeal the defendant contended that the possibility of suggestion by the hypnotist was so substantial that the in-court identification was necessarily tainted, warranting a reversal of the conviction.

The *Colligan* court rejected the contention, explaining: "In *People* v. *Johnson* (1974) 38 Cal.App.3d 1 . . . we held that a claim of improper pretrial identification will not be considered on appeal absent an objection in the trial court, because the trial court has no reason to inquire into the independent recollection of the witness if the issue is not before it. (38 Cal.App.3d at p. 6.) In that case, as here, faulty identification was at the heart of the defense and the witness was subjected to vigorous, detailed cross-examination on that issue. Furthermore defendant does not contend that hypnotic suggestions were actually made to [the witness] which affected her identification; thus no reason to depart from the view expressed in *Johnson* exists. We decline to hold that the use of hypnosis to help a witness remember a license number per se invalidates the identification of a person seen and heard by that witness. . . ." (91 Cal.App.3d at p. 850.)

Contrary to the majority's conclusion, I do not believe that faithful adherence to the *Frye* standard compels the all-encompassing per se exclusionary rule adopted in its opinion. Just last year, in *State* v. *Hurd* (1981) 86 N.J. 525 [432 A.2d 86], the New Jersey Supreme Court, in a thoughtful and scholarly opinion by Justice Pashman, applied the *Frye* standard to posthypnosis testimony and concluded that "a rule of *per se* inadmissibility is unnecessarily broad and will result in the exclusion of evidence that is as trustworthy as other eyewitness testimony." (432 A.2d at p. 94.) In *Hurd*, a number of preeminent authorities in the field of hypnosis—including Dr. Orne—testified in person at a pretrial evidentiary hearing. On appeal, the New Jersey court, after reviewing both this testimony and much of the same academic literature discussed by the majority in this case, pointed out that while the experts had made it clear that hypnosis is not a tool which can in any way guarantee the accuracy or historical "truth" of a subject's recall, they had at the same time indicated "that *in appropriate cases* and *where properly conducted* the use of hypnosis to refresh memory is comparable in reliability to ordinary recall." (432 A.2d at p. 95; italics added.)

Although keenly aware of the potential problems of "confabulation" and possible interference with cross-examination posed by hypnosis, the *Hurd* court recognized that recent psychological research has demonstrated that similar problems inhere in eyewitness testimony in general, particularly when—as is very often the case—a witness has been repeatedly interrogated and has recounted his proposed testimony several times before trial. (*Id.,* at p. 94.)[2] Indeed, given the majority's own rendering of modern views concerning the nature and fallibility of unhypnotized human memory (see, pp. 57-62, *ante*), it may not be entirely facetious to suggest that if we are to exclude eyewitness testimony unless shown to be scientifically reliable, we may have little choice but to return to trial by combat or ordeal.

Observing that courts have never required "historical accuracy as a condition for admitting eyewitness testimony," the *Hurd* court concluded that, under *Frye*, hypnotically aided testimony should properly be

---

[2]In this regard, the court cited Marshall et al., *Effects of Kind of Question and Atmosphere of Interrogation on Accuracy and Completeness of Testimony* (1971) 84 Harv.L.Rev. 1620; Levine & Tapp, *The Psychology of Criminal Identification* (1973) 121 U.Pa.L.Rev. 1079; Note, *Did Your Eyes Deceive You? Expert Psychological Testimony on the Unreliability of Eyewitness Identification* (1977) 29 Stan.L.Rev. 969.

admitted in a criminal trial if the party proffering the evidence demonstrates "by clear and convincing evidence" (*id.*, at p. 97) "that the use of hypnosis in the particular case was reasonably likely to result in recall comparable in accuracy to normal human memory." (*Id.*, at p. 95.) The court then went on to discuss in some detail various factors—e.g., the kind of memory loss encountered, the apparent motivations of the hypnotized witness, and the procedural safeguards under which the hypnosis session was conducted—that are likely to affect the reliability of posthypnosis testimony in a given case. (*Id.*, at pp. 95-97.)

In my view, if we are to reach the broad question of the general admissibility of posthypnosis testimony at this time, we should adopt the more cautious approach of the *Hurd* decision, rather than pronounce a general rule excluding virtually all posthypnosis testimony regardless of the facts of a particular case. Perhaps in the future, as we gain more experience in this area, we will find that posthypnosis testimony is so often unreliable that "the game is not worth the candle" (see p. 40, *ante*) and that a broad, prophylactic exclusionary rule is warranted. At this point, however, I think such a judgment is premature.[3]

Finally, it seems to me that if the majority opinion is correct, then the exception which the opinion establishes for previously hypnotized defendants who wish to testify is unsupportable. Whether the right to testify in one's defense is "fundamental" (*People* v. *Robles* (1970) 2 Cal.3d 205, 215 [85 Cal.Rptr. 166, 466 P.2d 710]) or constitutional (cf. *Washington* v. *Texas* (1967) 388 U.S. 14, 20-22 [18 L.Ed.2d 1019, 1023-1025, 87 S.Ct. 1290]), there can be no right to offer testimony which suffers from all of the potential vices which have triggered the majority's total ban on the testimony of hypnotized witnesses. While I have tried to explain why, in my opinion, the majority goes much too

---

[3]I note that the expansive exclusionary rule fashioned by the majority in this case is considerably broader than the rule adopted by the out-of-state decisions on which the majority purports to rely. As the Supreme Court of Arizona explained in its very recent decision in *State of Arizona* ex rel. *Collins* v. *Superior Court* (*Collins II*) (May 4, 1982) 644 P.2d 1279, 1295, virtually all of the jurisdictions which have announced a general rule excluding testimony of memory "refreshed" or "created" by hypnosis, have nonetheless held that under appropriate circumstances a previously hypnotized witness is not precluded from testifying about events which the witness remembered and reported before undergoing hypnosis. (See, e.g., *Collins II, supra*; *State v. Koehler* (Minn. 1981) 312 N.W.2d 108, 110; *State v. Wallach* (1981) 110 Mich.App. 37 [312

far, if the majority's reasoning is correct, I can see no basis for excepting the defendant on trial.

Respondent's petition for a rehearing was denied June 4, 1982, and the opinion was modified to read as printed above. Reynoso, J., did not participate therein. Richardson, J., and Kaus, J., were of the opinion that the petition should be granted.

N.W.2d 387, 404-405]; *Com.* v. *Taylor* (1982) 294 Pa.Super. 171 [439 A.2d 805, 806-808]; cf. *Polk* v. *State* (1981) 48 Md.App. 382 [427 A.2d 1041, 1048-1049]; *State* v. *Palmer* (1981) 210 Neb. 206 [313 N.W.2d 648, 655] (conc. opn. signed by equal number of justices as lead opn.).) Although it is unnecessary to reach the issue in this case, the majority—in dictum—apparently rejects even this moderate limitation on its sweeping "incompetency" rule. (See *ante*, p. 48, fn. 29, pp. 67-68.)